## 14972.　MARIETTA TRUST & BANKING CO. *et al.* v. FAW.

1. As against the usual general grounds of a motion for a new trial, a verdict directed by the court stands upon the same footing as if rendered without such direction, a special assignment of error being necessary to bring under review the judgment directing such verdict. *Dickenson* v. *Stults*, 120 *Ga.* 632 (48 S. E. 173); *Stone* v. *Hebard Lumber Co.*, 145 *Ga.* 729 (2) (89 S. E. 814).

2. Where a customer of a bank deposits therein a bond, for the sole purpose of safe keeping until its return is demanded by the depositor, the deposit is special; and such a special deposit is gratuitous if it be

accepted for the depositor's accommodation and without any undertaking by the depositor, express or implied, to pay or do anything as compensation or reward for keeping the deposit. *Merchants' National Bank of Savannah* v. *Guilmartin*, 88 *Ga.* 797 (2) (15 S. E. 831, 17 L. R. A. 322).

3. While slight diligence in the protection and preservation of a special deposit is the degree of care imposed by law upon a gratuitous bailee; yet where the bailee was a bank, already reduced to financial stringency by the defalcations of its vice-president, who, at the time the special deposit was made, had long been and still was in charge of the bank's business and assets, and who had, for years before the special deposit was made, successfully concealed from the president and directors all knowledge of his fraud and of the bank's real condition, by substituting forgeries for the money stolen by him from the bank, and who, after receiving the special deposit for the bank, stole it, converted it into cash, and placed that cash in the bank, substituting it for one or more of his prior forgeries, the bank cannot, while retaining the proceeds of the conversion of the special deposit, escape liability to the depositor on the theory that all the wrongful acts shown were the unauthorized individual acts of the vice-president, and that the bank itself had exercised due care in the preservation of the special deposit for the benefit of the depositor. If the bank had received no benefit or profit from the transaction, the result might be different. *Merchants' National Bank* v. *Guilmartin*, 88 *Ga.* 797, supra; s. c. 93 *Ga.* 503 (21 S. E. 55; 44 Am. St. R. 182); Davenport *v.* Underwood, 9 Bush (Ky.), 609; Bank *v.* Dunbar, 118 Ill. 625 (9 N. E. 186).

(*a*) Even if the bank had received no benefit from the transaction, still the length of time the vice-president's defalcations had existed—"seven or eight years, possibly longer," according to his own testimony—without knowledge or suspicion of the same on the part of the president or directors of the bank, and without their becoming acquainted with the bank's real financial condition, would leave it a question for determination by the jury as to whether or not the directors had exercised due care in retaining such a person in the office of vice-president and in charge of the bank's business and assets. Civil Code (1910), §§ 3470, 4530, 5735. A director of a bank has duties to perform more essential than that of allowing his name to be printed on the bank's stationery; and negligent ignorance is sometimes equivalent to knowledge, Penal Code (1910), § 204; *Schmidt* v. *Block*, 76 *Ga.* 823 (*a*); *Atlanta* v. *Perdue*, 53 *Ga.* 607; *Ocean Steamship Co.* v. *Matthews*, 86 *Ga.* 418 (2 *b*), 423 (12 S. E. 632).

(*b*) Nor will the bank be heard to plead, under the facts of this case, that its vice-president exceeded his authority as such officer in receiving the special deposit for the bank. Even if it conclusively appeared that he did so exceed his authority, still the bank must either repudiate or ratify the transaction as a whole. It cannot ratify in part and repudiate in part; and the retention by it of the net proceeds of the transaction amounts to a ratification by it of the whole transaction. Civil Code (1910), § 3593.

4. That the defendant bank is now in the hands of the State superintend-

ent of banks, who admittedly has in his custody sufficient assets of the bank to meet the plaintiff's demand, does not affect the result. *Park* v. *Carmichael*, 20 *Ga. App.* 36 (3) (92 S. E. 397), and citations; *Park* v. *Swann*, 20 *Ga. App.* 39 (3, 4) (92 S. E. 398), Ga. L. 1919, p. 158, sec. 15, p. 159, sec. 19; Ga. L. 1922, p. 65, sec. 7 (a).

5. Under the foregoing rulings the evidence not only authorized, but demanded, the verdict; and the court did not err in overruling the defendant's motion for a new trial.

DECIDED JANUARY 15, 1924.

Complaint; from Cobb superior court—Judge Humphries presiding. August 25, 1923.

*Fred Morris,* for plaintiffs in error.

*J. Z. Foster, Anderson & Roberts,* contra.

LUKE, J. The headnotes announce the principles decided. A statement of the facts on which they are based is the only elaboration necessary.

On February 20, 1923, Elizabeth C. Faw sued the Marietta Trust & Banking Company and T. R. Bennett, as superintendent of banks of the State of Georgia, alleging, in brief, the following: The defendant bank, after operating for several years as a chartered bank of this State, was, on February 4, 1922, taken over by the superintendent of banks in accordance with the terms of the banking laws of this State. Prior thereto (October 18, 1918) the bank received from her for gratuitous safe-keeping a described Liberty bond, acting therein through its vice-president in charge, A. H. Gilbert, who entered on her "savings pass-book" a receipt for the bond. No demand for the return of the bond was made on the bank prior to its failure, but demand was thereafter made upon the superintendent of banks. It was then discovered that, before the superintendent took the bank in charge, its vice-president, Gilbert, had embezzled the bond and applied it to the bank's benefit, without the plaintiff's knowledge or consent. The superintendent refused to account to her for the value of the bond from the assets of the bank, because the bond was not among the assets of the bank when he took it over. She insists that by reason of the foregoing facts she is a common creditor of the bank and entitled to share in the distribution of its assets upon the same basis as ordinary depositors. She further alleges: that she made due proof of her claim to the superintendent; that he refused to recognize the same; that he paid a number of dividends to other

common creditors of the bank, without making any payment to her; and that he "has ample assets in his custody and possession belonging to said bank to pay petitioner the amounts due her as aforesaid." The prayer was for process and for judgment.

The defendants answered, admitting the bank's status as alleged; that payment of the plaintiff's claim had been refused; and that sufficient assets of the bank were then in custody of the superintendent to meet the plaintiff's alleged demand. The defendants denied, however, that the plaintiff had made any deposit as alleged by her, and further alleged: that if Gilbert received the bond at all, he did so in his individual capacity, and not as vice-president of the bank or for the use and benefit of the bank, and, after so receiving it, converted it to his own individual use and benefit, and not to the use or benefit of the bank, before the bank was taken over by the superintendent; that if Gilbert undertook to act for the bank in so receiving the bond, he acted beyond the scope of his authority, and his act was never known to or authorized by the bank's president or board of directors; that in any event the bank was at most a gratuitous bailee, liable only for gross negligence, of which it was not guilty, and bound only to the exercise of slight diligence, which it had exercised; that in spite of such diligence on its part and without its knowledge or consent Gilbert had stolen the said bond, acting therein not for the bank or the bank's benefit, but for himself individually and against the bank, using the proceeds of the sale thereof "in an effort to cover up his pre-existing shortage at said bank, which had existed for a number of years, and was ever increasing," and using the same "either to enable him to retire a 'forged note' or to retire a 'cash ticket,' neither of which was an asset—a legitimate asset—of this defendant."

Upon the trial the plaintiff and Gilbert were the only witnesses introduced. He testified by depositions as a witness for her. Both testified to the making of the deposit and to the receipt issued therefor, substantially as alleged in her petition. The receipt itself was introduced in evidence. Gilbert further testified in substance as follows: The receipt was written partly by the bank's cashier and partly by himself, as vice-president, both acting for the bank and within the scope of their respective duties and authority in so doing. As vice-president he had practically entire

charge and control of the bank and its assets during all the time he was connected with it, from July, 1907, to February 4, 1922. Before the bank was taken over by the superintendent it became temporarily in need of funds; and, to meet that situation, he, acting for the bank, converted the bond into cash and placed the money in the bank for its use and benefit, without book entry of any kind, the cashier being the only other officer of the bank with knowledge of the transaction at the time. Neither he nor the cashier individually received or used any part of the proceeds of the sale of the bond. For a period of seven or eight years, possibly longer, he had been using the bank's money in his own private speculations, and the cashier had been doing the same, each with knowledge of the other's acts, all of which were unknown to any other officer of the bank until about the time of its surrender to the superintendent of banks. The joint defalcations of himself and the cashier amounted, at the time of the surrender, to approximately $230,000. The shortage had been carried partly in the loan account and partly in the cash account, by means of forged notes and memoranda receipts or tickets, thereby keeping it covered up for a number of years. When he sold the plaintiff's bond and put the proceeds thereof in the bank he merely destroyed enough of this fraudulent paper to keep his books in balance.

The remainder of Gilbert's testimony, so far as it is here material, appears in the brief of evidence, as brought out on cross-examination, in the following language: "The service I rendered or was expected to render in looking after the safe-keeping of the bond about which I have been asked was for the exclusive benefit of the bailor, the plaintiff. All that was necessary to be done was to put the several envelopes containing these bonds in the vault of the bank, or some other safe place, and let them remain there unmolested, in order to preserve them and prevent a loss to the plaintiff. In this respect there was no negligence in looking after this bond by any officer of the bank. If the bond had not been removed by me individually and sold, as stated, the plaintiff would not have sustained any loss. The sale of this bond was not made in the prosecution of or within the scope of the legitimate business of the bank or of my employment as vice-president. The bank, so far as the bank was concerned, independent of my sale of the bond, exercised all the care that was necessary to safely keep the bond

about which I have been asked. No official of the bank, except the cashier, had any knowledge that I 'was not conducting the affairs of the bank in a perfectly proper and legitimate way prior to or about the time it was surrendered to the superintendent of banks. There was nothing in this connection that would have caused any official of the bank to suspect that my record was not as good as it had been at any time during my connection with the bank. I was not retained in the employment of the bank after it was brought to the knowledge of the president and directors that my account was not correct and that the bank was not being conducted in a legitimate manner. The bank was closed on that day. In the sale and disposition of the bond about which I have been asked I was acting independently and without the knowledge, consent, or direction of any official of the bank; and the effect of the sale was simply to reduce the amount of the shortage in the bank which had been brought about in handling the funds of the bank prior to that time, in speculation. I entered a plea of guilty in Cobb superior court on several indictments growing out of my shortage with the Marietta Trust & Banking Company, and I am now an inmate of the penitentiary of Georgia on that account."

Upon the conclusion of the evidence the court directed a verdict for the plaintiff. The defendants moved for a new trial upon the usual general grounds only; and the exception here is to the judgment of the lower court overruling that motion. The court properly overruled the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*