# Wytheville.

STATE BANK OF PAMPLIN v. J. L. PAYNE AND W. K. PAYNE.

June 18, 1931.

Present, Prentis, C. J., and Campbell, Holt, Epes and Gregory, JJ.

The opinion states the case.

*J. V. Lewis, R. S. Weaver, Jr.,* and *Thos. W. Oglin,* for the plaintiff in error.

*Allen & Jefferson,* for the defendants in error.

PRENTIS, C. J., delivered the opinion of the court.

The State Bank of Pamplin, plaintiff, seeks to recover of the defendants, J. L. Payne and W. K. Payne, on two notes for $5,000.00 each. There was a jury trial, a verdict for the defendants, which the trial court refused to set aside, and final

judgment was entered for the defendants, of which the bank is here complaining.

The essential facts are few and undisputed. The bank was closed by the State Bank Examiner on May 5, 1928, because he had discovered a deficiency in the assets of the bank approximating $36,000.00. This was due to the embezzlement of S. Pierce Loving, the cashier. Loving had been the active executive, apparently in full control of the bank. The two $5,-000.00 notes on which this action is based had been carried as assets of the bank only since the preceding January. They appear to have been drawn by J. L. Payne, were payable to the bank, and endorsed by J. L. and W. K. Payne, defendants.

Previous to September, 1925, the defendants did a banking business with the plaintiff bank. The board of directors had extended them a line of credit not to exceed $40,000.00. The conditions under which this line of credit was to be extended, within that limit, were left to the cashier, Loving. The defendants were in the tobacco business at Drake's Branch, Virginia, and on markets in the South. They did not know the precise amounts which they would need to take care of their checks, and so signed and endorsed several notes in blank and delivered them to Loving, as they say, as cashier of the bank, with specific directions only to fill in the notes for the amounts as needed from time to time, and place the proceeds to the credit of their checking account. They also testified that these blank notes were delivered in the presence of other officers or employees of the bank.

Pursuant to this authority, two notes were filled in for $5,-000.00 each and discounted August 30, 1924, the proceeds thereof being deposited to the credit of defendants. The amount of the debt of defendants to the bank September 3, 1925, had been reduced to $5,000.00, and on that date this debt was fully paid. Their checking account with the bank was closed, and since then there have been no further transactions between the plaintiff bank and the defendants. At that time

the defendants demanded the return of their cancelled notes, as well as all unused notes signed in blank which were then in the possession of the cashier. They were by him informed that the particular note then being paid had been rediscounted, and that the cashier had destroyed all their unused notes which had been signed in blank.

It is further shown that two months after the defendants, in September, 1925, had closed their account and paid the last of the two notes for $5,000.00 each, which have just been described, Loving, the cashier, substituted therefor his own note for $10,000.00. This note was thereafter carried by the bank until January 27, 1928, when Loving, without the knowledge of the defendants, filled up and substituted for his own $10,-000.00 note the two notes of the defendants for $5,000.00, each which are the subject of this litigation. The $10,000.00 note of Loving and the two notes of the defendants for $5,000.00 each, first above referred to, which had been fully paid, together with several unused blank notes, were found in the private lockbox of the cashier after the closing of the bank.

The entries confirming these facts were made upon the books of the bank, and it was shown that other false entries had been made by Loving. In all of the personal transactions between the defendants and the bank, Loving alone acted for the bank. No other officers or agents of the bank acted in connection with these notes.

The evidence shows, then, that the defendants derived no benefit whatever from the fraudulent substitution, in January, 1928, of their notes for the $10,000.00 note of the cashier. The bank did not at that time part with any value or lose any of its rights against the cashier, and the defendants received nothing, their account with the bank having been closed more than two years theretofore.

The cashier substituted the defendants' notes, without their knowledge, for the purpose of concealing his own defalcations. It appears that the reason for the substitution in January, 1928,

of the defendants' notes for the cashier's $10,000.00 note was because some question had been raised about the matter, and the substitution was made by Loving to allay suspicion. During the intervening period, after the defendants had ceased to transact their business with the bank, the interest upon his debt had been paid by the cashier, Loving. The first intimation which the defendants had that their notes were being held by the bank was after the bank had closed, in May, 1928. In September, 1925, when defendants closed out their account, Loving owed the bank approximately $16,000.00, for which it held his notes. The total defalcations of the cashier were $36,500.00, and the $10,000.00, represented by the notes here sued on, was included therein. The cashier had given a $20,-000.00 bond, and demand was made upon the bonding company by the plaintiff bank, the $10,000.00 represented by the notes here sued on being included as part of the defalcation creating the debt due to it by its cashier.

While there are three assignments of error, they involve the same question. For the bank it is contended that the cashier was not its agent in the final fraudulent transaction; that it is an innocent holder in due course of the notes in suit, and that the negligence of the defendants in leaving these signed notes with the cashier makes them liable thereon to the bank.

On the other hand, the defendants contend that as in the delivery and discount of the original notes of the defendants, the bank was represented solely by Loving, the cashier, and no other agent or officer of the bank had any direct connection therewith; that, therefore, the knowledge of Loving, cashier, was then and therefore continued to be the knowledge of the bank, and also that the bank was not a holder in due course of the notes sued on, because they had been signed in blank for a specific purpose, with specific instructions as to when and for what purpose the blanks were to be filled and the notes discounted; that they were not filled within a reasonable time, nor

in accordance with the authority given and, therefore, are not valid obligations of the defendants.

The case has been elaborately argued; many cases have been cited, many sound principles as to agency referred to, but in the view which we take of the case it is unnecessary to repeat the elaborate discussions of these questions, with which the books already abound, and which are easily accessible. We shall confine ourselves to the precise legal question which the conceded facts present.

It is hardly necessary to cite authority for the broad general doctrine that the principal is bound by the knowledge of an agent; that so far as third persons are concerned, notice to an agent is notice to his principal, even though the agent has not in fact communicated such notice. The basis for that rule is the duty of the agent to disclose all material facts coming to his knowledge with reference to the subject of his agency, and the presumption that he has discharged that duty. There is an important exception, however, to this rule, in cases where the knowledge of the agent is obtained while he is himself engaged in committing an independent fraudulent act on his own part, communication of which to the principal would prevent its consummation. To this exception there is a qualification, equally important and decisive; that is, in cases in which the agent, when committing the fraud, was the sole representative of the principal. When this appears, the general rule of imputed notice to his principal applies.

In 2 L. R. A. (N. S.) 994, it is said that the authorities favor "a qualification of the foregoing exception so as to exclude therefrom and, therefore, to bring within the general rule which charges the principal with knowledge possessed by the agent, cases where the officer, though he acts for himself or for a third person, is the sole representative of the corporation in the transaction in question."

The later cases clearly establish that qualification.

So then, bearing in mind the rule, the exception and the

qualification of the exception now clearly established, the precise question here is whether this bank can take advantage of the fraud of its cashier upon these defendants when it is shown that the fictitious credit acquired by his fraud was used to meet the prior indebtedness of the cashier to the bank.

A recently and carefully considered case is *Knobley Mountain Orchard Co.* v. *People's Bank of Keyser,* 99 W. Va. 438, 129 S. E. 474, 48 A. L. R. 459. In that case the cashier of the bank was also treasurer of the orchard company, with authority to draw checks for his company. The cashier's own accounts and those of his brother were heavily overdrawn, and by means of checks the cashier transferred to the bank the funds of the orchard company in settlement of these overdrafts. It was held that the bank could not close its eyes to the fact that these payments were made with funds which did not belong to its debtors, the cashier and his brother, and which it had no right to receive in settlement of these overdrafts, and that it was liable to the orchard company for the misappropriation. It is held that the knowledge of the sole official of the bank acting for and in the interest of the bank is imputed to it, and when it undertakes to claim the benefit of his wrongful acts, it becomes subject to the consequences of his knowledge; that a corporation cannot ordinarily ratify the act of its officer and disaffirm the fraud by means of which the act was accomplished.

This case and this question are elaborately annotated in 48 A. L. R. 464.

There are many instances which support these conclusions in cases involving bank officials.

*Mays* v. *First State Bank* (1923, Tex. Com. App.), 247 S. W. 845, 846, hold that the knowledge of the cashier of a bank in using negotiable paper given him by the true owner to be used as security for a loan, which was improperly used by the cashier to replace money of the bank previously misappropriated by him, is imputable to the bank, notwithstanding the

adverse interest of the cashier, and that his knowledge prevents recovery by the bank on the notes.

Among other things, after referring to the peculiar status which exists when an officer is dealing at the same time with and for a corporation, this is said in that case: "Everything known to him in his individual capacity concerning the transaction is known to him in his capacity as agent and representative of the corporation. When he assumes the duties of agent and representative of the corporation, in that transaction, there passes with him into that capacity all that he knew of the transaction in his private individual capacity. Where he is the sole representative of the corporation in the transaction, under such circumstances, the corporation is as wise as the customer or client. * * * In such case the corporation would be charged with the facts—yes, would know the facts—and the corporation would not be permitted, in equity and good conscience, to avail itself of the acts of its officer in dealing with himself, without being held to possess all the knowledge concerning that transaction that he possessed at the time thereof. * * * To hold that the bank, under these circumstances, is entitled to the benefits of its agent's acts, without responsibility for his knowledge, would open the way for injustice and wrong by the agents and officers of banks and other corporations against the public."

Then, as to the suggestion that the bank is equally innocent with the defendants, but less culpable, in the commission of the wrong of the cashier:

In *National Bank* v. *Whitney,* 181 Cal. 202, 183 P. 789, 8 A. L. R. 298, it is held that assuming that both the defrauded party and the bank are equally innocent of the wrong in connection with the transaction, the loss resulting must fall upon the bank, and not upon the customer, under the principle of law that where one of two innocent parties must suffer by the fraud or negligence of a third, whichever of the two has accredited him ought to bear the loss.

Here, however much at fault the defendants were in leaving their blank notes with the bank cashier, and giving him limited authority to fill in the blanks, certainly they are no more at fault than the bank was in accrediting the cashier as its trusted agent, and thereby affording him the opportunity to commit the fraud upon the defendants.

In *Marietta Trust & Banking Co.* v. *Faw,* 31 Ga. App. 507, 121 S. E. 244, this appeared: The officer of the bank had exceeded his authority and accepted certain bonds for safekeeping, which he afterwards used to cover up his own default. It was held that the bank could not plead that the officer exceeded his authority in receiving the deposit, for even though it appeared that he did so exceed his authority, still the bank must ratify or repudiate the transaction as a whole; it cannot partly ratify and partly repudiate it, and the retention by the bank of the proceeds of the transaction amounts to a ratification of the whole transaction, and so the bank was held responsible for the misappropriation.

In *Emerado Farmers' Elevator Co.* v. *Farmers' Bank,* 20 N. D. 270, 127 N. W. 522, 29 L. R. A. (N. S.) 567, this appeared: The cashier had misappropriated the funds of the bank and become indebted to it, and in order to conceal his defalcation transferred to the bank funds of an elevator company of which he was treasurer, and it was held that the bank, having accepted that payment through its cashier, could not retain the benefits of such fraudulent act without accepting the consequences of his knowledge, and that the only way in which it could retain them being through the ratification of the fraudulent act of its agent, the cashier; in doing this it becomes *particeps criminis* with the cashier, and liable at the suit of the depositor to the amount of the funds so fraudulently transferred.

In *Lowndes* v. *City National Bank,* 82 Conn. 8, 72 Atl. 150, 152, 22 L. R. A. (N. S.) 408, where a cashier who was an executor wrongfully transferred funds belonging to an estate

in order to conceal his own defalcations, the court enforces the same principle and, among other things, says: "The acceptance of the checks as authority for the transfer to the general assets of the bank from the deposit funds of the estate of the amount represented by them, and the attempt to carry that transfer into effect, was, therefore, to make it a partaker in the fruits of a known fraud, and that, too, the fraud of its own agent. This the most elemental principles of the law forbid, and there is no need, in sustaining the action of the trial court in rendering a judgment covering these items, to resort to any imputation to the bank of knowledge by reason of such knowledge being possessed by Layton (the cashier), or to any constructive knowledge on its part by reason of the negligence of the directors in their oversight of the affairs of the bank, which the court has found, or to the principle stated in *Fairfield* v. *Southport Nat. Bank,* 80 Conn. 92, 103, 67 Atl. 471, 475, that 'when an agent * * * accepts, on his principal's behalf, money belonging to and fraudulently obtained from another, with knowledge of the fraud, that principal, in treating this money as his own and retaining it as against the true owner, cannot claim as his own the act by which the money was accepted, without also admitting as his own the knowledge with which the act was done.' "

In *State* v. *American State Bank,* 108 Neb. 98, 187 N. W. 759, it is said that it would be a shocking test of business rectitude to recognize the agency of the bank manager as representative of the bank for receiving and accepting a check for deposit, and at the same time renounce his agency for the purpose of justifying a wrongful distribution of the proceeds; that in accepting a check for the bank to be deposited therein, his knowledge was imputable to the bank.

This court recognized the qualification of the exception to the general rule in *Pennington* v. *Third National Bank,* 114 Va. 674, 77 S. E. 455, 457, 45 L. R. A. (N. S.) 781. There this occurs: "The correctness of the general principle is con-

ceded, but it is said that this case falls within the exception to the doctrine of imputed knowledge (which doctrine is founded upon the presumption that an agent discloses his knowledge to his principal), because the fact that the insolvency of the bank was due to the defalcation of the cashier repels the presumption that he imparted the knowledge to the bank. *Baker* v. *Berry Hill* [*Mineral Springs*] *Co.,* 112 Va. 280, 71 S. E. 626 [L. R. A. 1917F, 303].

"We cannot agree that this case is controlled by the foregoing exception. The defalcations of the cashier and his assistant, which caused the insolvency of the bank, occurred prior to the receipt and collection of the draft in question, and the transaction was not between him and the bank, but between him, acting for and representing the bank as its executive officer, and the bank's customer, the Georgia bank. Throughout the transaction the cashier was acting for, and as the sole representative of, the bank, and in the line and within the scope of the powers and duties of his office with respect to the matter in hand, and, therefore, his knowledge of the insolvency of the bank (though brought about by his antecedent misconduct) was its knowledge. In other words, the insolvency of the bank was a condition within the knowledge of its executive officer, and it matters not, so far as the rights of innocent third persons dealing with the bank through him are concerned, how he first acquired knowledge of that condition." Citing many cases.

Among the cases cited there is *Atlantic Cotton Mills* v. *Indian Orchard Mills,* 147 Mass. 268, 17 N. E. 496, 501, 9 Am. St. Rep. 698, and this is quoted therefrom: "It is true that no officer of the plaintiff, besides Gray, knew of the fraudulent origin of these checks, but in the very transaction of receiving them, the plaintiff was represented by Gray, and by him alone, and is bound by his knowledge. It is the same as if the plaintiff's directors had received the checks, knowing what he knew. For the purpose of accepting the checks, Gray stood in the place of the plaintiff and was the plaintiff. It is

quite immaterial, in reference to this question, in what manner or by what officers of the corporation the funds were afterwards used."

And again, quoting from the same case : "We have preferred to put the decision of this point upon the broad ground that if the treasurer of a corporation is a defaulter, and his defalcation is as yet unknown and unsuspected, and he steals money from a third person and places it with the funds of the corporation in order to conceal and make good his defalcation, and the corporation uses the money as its own, no other officer knowing any of the facts, the corporation does not thereby acquire a good title to the money as against the true owner, but the latter may maintain an action against the corporation to recover back the same."

Other cases enforce the same rule, but it is unnecessary further to extend the citations. When the blank notes of these defendants were, for convenience, left with the cashier of the plaintiff bank, in order that they might be discounted by the bank for the purpose of raising funds upon which the defendants might check, certainly the cashier then represented the bank. Even if it were true, however, that when he committed the fraud three years later by fraudulently filling up the notes for the purpose of covering up his own defalcations, it could possibly be held that his *status* had changed, and that in the interval he had become the sole agent of the defendants, it would still follow that the bank could not take advantage of this fraud by repudiating the agency of its cashier. It cannot accept the benefits of such a fraud without violation of the fundamental rule of common honesty which the cases cited illustrate.

It is claimed here, however, that *Culpeper National Bank* v. *Tidewater Improvement Co.,* 119 Va. 73, 89 S. E. 118, refused to recognize this rule. We do not so construe the case. It is true that the case refers to the exception to the general rule, and does not refer to the qualification of this exception. The

facts, however, are quite different from those here shown. The action there for recovery of the fund which had been fraudulently diverted was not instituted until nearly six years after the transaction, and the case was reversed and remanded because of error of the court in an instruction as to the running of the statute of limitations.

██ ██ There is still another reason why the bank cannot claim as a holder of the defendants' notes in due course. This is found in the negotiable instruments law, Code, section 5576. That section reads:

"*Blanks; when may be filled.*—Where the instrument is wanting in any material particular the person in possession thereof has a *prima facie* authority to complete it by filling up the blanks therein. And a signature on a blank paper delivered by the person making the signature in order that the paper may be converted into a negotiable instrument operates as a *prima facie* authority to fill it up as such for any amount. In order, however, that any such instrument, when completed, may be enforced against any person who became a party thereto prior to its completion it must be filled up strictly in accordance with the authority given and within a reasonable time. But if any such instrument, after completion, is negotiated to a holder in due course, it is valid and effectual for all purposes in his hands, and he may enforce it as if it had been filled up strictly in accordance with the authority given and within a reasonable time."

The notes here involved were never negotiated to a holder in due course, for this implies a completed note transferred to one theretofore a stranger to the transaction. These blank notes were originally made payable to the order of the State Bank of Pamplin and have never been transferred. They were left with the cashier of the bank to be discounted by the bank for the benefit of the endorsers only if necessary to meet their checks. The blanks therein, instead of being filled, as the statute requires, strictly in accordance with the authority given, just the

contrary is true. They were fraudulently filled by the plaintiff's cashier, without any authority whatever and for a different purpose. Again, in order to be valid in the hands of the bank, the authority given should have been exercised as the statute requires, "within a reasonable time," and certainly the filling of the blanks therein nearly three years after the original authority therefor was, under the circumstances here appearing, not within a reasonable time. Under the facts shown in this case, the bank, not being a holder in due course but being the payee prior to their completion, this section of the statute supplies a complete defense.

As no judgment other than one in favor of the defendants could have been properly entered, it is unnecessary to say anything about the instructions. We perceive no error in those given, but whether erroneous or not the judgment under the facts proved is plainly right.

*Affirmed.*