### Richmond

WILLIAM H. BURRUSS, JR., ET AL.

V.

GREEN AUCTION AND REALTY COMPANY, INC.

Record No. 820136.

September 7, 1984.

Present: All the Justices.

*J. Michael Gamble (Pendleton and Gamble*, on briefs), for appellants.
*Michael M. Rand (Slayton, Bennett and Rand*, on brief), for appellee.

PER CURIAM.

The sole question in this appeal is whether the evidence supports the trial court's finding that a real estate broker had not breached his fiduciary duty to disclose material information to his principals, and that he, therefore, was entitled to recover his commissions. Green Auction and Realty Company, Inc., a real estate brokerage firm, brought an action against Hugh M. Guthrie, William H. Burruss, Jr., and Wayne B. Booth for commissions claimed upon a sale of 430 acres of land in Pittsylvania County. At a bench trial, the court awarded judgment to the plaintiff, Green Auction. The defendants, Burruss and Booth, appeal; Guthrie does not.

There is little conflict in the evidence. Burruss, Booth, and Guthrie had a long history of investing together in speculative purchases and resales of land, in equal shares. They regarded themselves as partners in these transactions, although they never entered into a formal partnership agreement. In 1973, the three purchased, as tenants in common, the 430-acre tract in question, known as the Corbin Farm. Later that year, they sold the timber on the land to the Chesapeake Corporation, giving Chesapeake three years to remove the timber. In 1974, they jointly borrowed $80,000.00 from the Federal Land Bank of Baltimore, secured by

a first lien deed of trust on the Corbin Farm. Later, Guthrie cleared a part of the land for crops; a house on the land burned down; two bulk barns were removed; and a tobacco allotment worth $42,000.00 was "switched" to other land.

In 1976, Guthrie requested the owner of Green Auction, Donnie M. Green, to prepare an appraisal of the Corbin Farm to be used in connection with a financial statement Guthrie was preparing for some transactions in Georgia and Alabama. Donnie Green did not visit the property at the time he made the appraisal, but he had seen the land before Guthrie and the other two investors purchased it in 1973. Green gave Guthrie a written appraisal of the land at $303,020.00, dated June 18, 1976. However, because Green was unaware of the changes, mentioned above, which had affected the land since 1973, his appraisal did not reflect them.

In 1977, Guthrie, without informing Burruss and Booth, applied to the Farmer's Home Administration for a "disaster loan," offering his one-third undivided interest in the Corbin Farm as security and tendering Green's 1976 appraisal as evidence of value. The loan was closed in September 1977, in the amount of $50,820.00, secured by a deed of trust which constituted a second lien on Guthrie's one-third interest.

In December 1977, the three owners met with Green to discuss a sale of the land. No mention was made of Green's 1976 appraisal, or of Guthrie's recent encumbrance of his one-third interest. The owners authorized Green to sell the property for a commission of 10% of the sale price, provided it sold for $276 per acre or more. In December 1978, Green sold the land at public auction for $150,000.00, or $348 per acre. Green Auction claimed a commission of $15,000.00 on the sale.

Burruss and Booth first learned of Guthrie's second trust a month after the sale, when advised of it by the purchaser's attorney. Guthrie was unable to secure a release of his interest from the second trust lien within the time limits agreed upon at the auction sale, and Burruss and Booth were required to conduct a partition suit in order to deliver good title to the purchaser. This delayed the settlement for two years, until December 1980, when the property was conveyed to the purchaser by a court-appointed special commissioner. Citing the damages caused by this delay, Burruss and Booth refused to pay Green's commission.

Burruss and Booth testified that if they had known of Green's $303,020.00 appraisal, they would have thought it "ridiculous,"

and would have been "highly suspicious." Both thought the land was worth less than half that amount. Such an inflated appraisal, they said, would have caused them to employ a different broker to sell the land, and would have caused them to "do a lot of investigation" as to the reason the appraisal was made. Such an investigation, they argue, would have led them to discover Guthrie's second trust, and timely discovery would have enabled them to take steps to avert the expense and delay of partition.

Green testified that he did not mention the 1976 appraisal to Burruss and Booth while discussing the sale of the land because he "did it for Mr. Guthrie; not for them." He had not forgotten about it, but realized at the time of the discussion in December 1977 that it was "too high." However, he testified that when he made it in June 1976, he was unaware of the changes which had reduced the value of the land since 1973. He knew Guthrie intended to use it in connection with a financial statement, but was unaware that Guthrie was seeking a loan and intended to encumber his interest in the land.

It is true, as Burruss and Booth point out, that a broker owes his principal the duty to use utmost fidelity to him and must disclose to him all facts within the broker's knowledge which may be material to the transaction, or which might influence the principal in deciding upon a course of action. *Va. Real Estate Comm.* v. *Bias*, 226 Va. 264, 269, 308 S.E.2d 123, 125-26 (1983); *Metro Realty* v. *Woolard*, 223 Va. 92, 98, 286 S.E.2d 197, 200 (1982); *Owen* v. *Shelton*, 221 Va. 1051, 1054, 277 S.E.2d 189, 191 (1981). We find ample support in the record, however, for the trial court's conclusion that Green fully met this duty.

It is probable that Burruss, Booth, and Guthrie were joint venturers rather than partners, as they described themselves. *See Smith, Adm'r.* v. *Grenadier*, 203 Va. 740, 744, 127 S.E.2d 107, 110-11 (1962). *See also Am. Realty* v. *Chase Manhattan*, 222 Va. 392, 406, 281 S.E.2d 825, 833 (1981). But for the purposes of this case the distinction makes no difference, because the relationships and duties of joint venturers and partners, toward one another, are essentially the same. *Jackson Company* v. *City of Norfolk*, 197 Va. 62, 67, 87 S.E.2d 781, 785 (1955). Joint venturers, like partners, have the dual status of principals for themselves and agents for all other joint venturers, within the scope of the enterprise. *Id.* at 67, 87 S.E.2d at 785. *See also Alban Tractor Co.* v. *Sheffield*, 220 Va. 861, 863, 263 S.E.2d 67, 68 (1980). Each has a

high degree of fiduciary duty toward the others arising out of the confidential relationship between them. This includes a duty to each to make full and frank disclosure to the others of all facts within his knowledge that may affect the value of the others' interests. *Yost* v. *Critcher*, 112 Va. 870, 875, 72 S.E. 594, 595 (1911).

The evidence shows that Green was fully aware of the business relationship among the three joint venturers. He was entitled to rely on the familiar maxim that notice to an agent of matters relating to the subject of the agency is notice to his principals. It is presumed that the agent will disclose to the principals all matters which it is his duty to disclose to them. Outsiders dealing with the agent are entitled to rely on this presumption whether the agent in fact communicates his knowledge to the principals or not. *State Bank* v. *Payne*, 156 Va. 837, 843, 159 S.E. 163, 165 (1931).

Thus, Green discharged his duty as a broker by communicating all the material information in his possession to Guthrie and had a right to assume that Guthrie would discharge his corresponding duty by keeping his fellow joint venturers fully informed. Green incurs no liability from any subsequent breach of duty on Guthrie's part. Not being guilty of any breach of fiduciary duty, Green Auction was entitled to the commissions for which it contracted.

Finding no error in the record, we will affirm the judgment.

*Affirmed.*