PLITT *v.* KELLAM ET UX.

[No. 196, September Term, 1959.]

*Decided May 13, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Marvin Braiterman,* with whom were *Sheldon H. Braiter-
man* and *Benjamin Swogell* on the brief, for the appellant.

*William Saxon* for the appellees.

HAMMOND, J., delivered the opinion of the Court.

The trial court struck out a judgment by confession in a
suit by C. M. Plitt, the payee of a promissory note for
$9,500 against the makers, Sidney Kellam and his wife
Annette, then entered judgment for the Kellams for costs,
and Plitt appealed.

Kellam was an accommodation endorser on a $6,600 note
payable to one Epstein, which Plitt had bought, and also owed
Plitt $5,200 which had been reduced to judgment. Plitt had
sued Epstein and, after a motion for summary judgment for
the plaintiff had been made and opposed, the $6,600, plus in-
terest and fees, sued for was settled for $2,000 and an order
of "Paid, Settled and Satisfied" was filed, signed by Plitt's
attorney, Blacker, then a member of the Bar in good standing,
and Epstein's attorney, Putterman.

Plitt testified he was pressing Kellam for payment of the
balance of the Epstein note and, also, the $5,200 judgment.
Kellam admits that he was being pressed but says it was on
the Epstein obligation only and that the judgment had been
paid and had nothing to do with the giving of the note (al-
though he is not sure whether it was paid before or after the

giving of the note). They agree that Kellam bought a period of peace by giving the note on which the case before us was brought. Blacker and Epstein did not testify.

Mrs. Kellam signed the note in blank and gave it to her husband to be used as he saw fit. He wrote in Plitt's name as payee, signed it and gave it to Plitt's lawyer, Blacker. He testified unequivocally it was given with the limitation that Blacker was to find out what balance was still due on the Epstein note and advise him and then he, Kellam, would complete and deliver the note. Kellam says, Plitt denies, that he had paid Plitt $660 on the $6,600 note, and Kellam knew that Epstein had made some payment (but not how much) and did not know that the suit against Epstein had been marked "Paid, Settled and Satisfied." [1] Kellam says he gave the incomplete note to please Blacker, with whom he was then on very friendly terms, to show good faith towards Plitt and to evidence to Blacker his "intention to give him a note for the actual amount due Mr. Plitt."

Blacker filled in the date of the note, that it was to be payable ninety days after date, and the amount of $9,500 in figures and in writing, and delivered it to Plitt. On the lower left corner of the note as filed in the case appears the word "Guarantor" over the signature of Epstein. At what point the word and the signature were put on the note and for what purpose and intended effect, the record does not reveal.

The trial judge first held that the note was unenforceable on two grounds—because there was no authority given to fill in the note for $9,500 and because Kellam, as one secondarily liable, was discharged from liability when the order of satisfaction was filed in Plitt's case against Epstein, a prior party. After considering the motion for a new trial, the judge felt that Kellam, as attorney of record for Epstein, was chargeable with knowledge that his client had paid two thousand dollars to Plitt and "had been released * * * by an order of satisfac-

---

1. Kellam, then a member of the Bar, had originally represented Epstein in the suit by Plitt on the note but later Putterman's appearance was entered for Epstein and, although Kellam's appearance was not stricken, it would appear he took no further part in the case.

tion" and, seemingly, felt Kellam would be bound if he gave the challenged note with that knowledge. He adhered, however, to his original finding that the note was delivered in blank, that it was not clear that Blacker had any authority to fill it up for any amount, but that if he did, the authority was definitely limited and that "the authority, if any, given Blacker, was for Blacker to fill it up after sitting down with Kellam and arriving at the amount that Kellam owed Plitt." The gaps in the record make it impossible to ascertain various facts which could affect, or determine, significant questions the case could pose. We think, however, that the trial court's findings of fact are supported by the testimony he heard and that, in addition, the evidence is entirely persuasive that the Kellams undertook to give the note only for such amount as remained unpaid on the Epstein note.

As we see it, Code (1957), Art. 13, Sec. 35, controls, and for the most part, disposes of the case. It provides that when an instrument is wanting in any material particular, the person in possession "has a prima facie authority to complete it by filling up the blanks therein." The section thereafter continues: "In order, however, that any such instrument, when completed, may be enforced against any person who becomes a party thereto prior to its completion, it must be filled up strictly in accordance with the authority given, and within a reasonable time. But if any such instrument, after completion, is negotiated to a holder in due course, it is valid and effectual for all purposes in his hands, and he may enforce it as if it had been filled up strictly in accordance with the authority given, and within a reasonable time."

In reaching a decision we assume, for the purpose of the case, that Blacker acted contrary to Plitt's explicit instructions in ordering the suit against Epstein settled and satisfied, rather than merely giving credit for the amount paid, and that neither Epstein nor Kellam were discharged from liability to Plitt for the balance due after the payment. We assume further, again without deciding, that there was a delivery of the note sufficient to make it valid under the terms of Code (1957), Art. 13, Sec. 37, rather than one "conditional, or for a special purpose only, and not for the purpose

of transferring the property in the instrument," although the evidence makes this a doubtful assumption. Compare *Devries & Co. v. Shumate*, 53 Md. 211; *Jenkins v. First National Bank*, 134 Md. 85, 86; *Townes v. Cheney*, 114 Md. 362, 365.

Plitt argues to us (1) that the note was filled up substantially in accord with the authority given and was therefore valid;[2] (2) that the note is valid for the amount in fact authorized; and (3) that Plitt was a holder in due course so that if authority was exceeded in filling out the note, his right to collect in full was not impaired.

On the first point, without consideration of the unauthorized filling in of the date and the maturity of the note—compare *Vane v. Stanley Heating Co.*, 160 Md. 24—the findings of fact below, in which we concur, that the note was to be made out only for the unpaid portion of the Epstein debt, disposes of this contention of appellant.

There is no Maryland authority in point, but elsewhere the law is against Plitt on his second contention. Cases in Mississippi and Kentucky support him in holding that a note filled out for more than had been authorized may be enforced for the amount authorized. The majority view, with which we agree and which reflects the opinions of both the courts and the writers, is that when the statute says the instrument must have been filled up "strictly in accordance with the authority given" if it is to be enforced by one not a holder in due course, it means that if it is not so filled up it may not be enforced to any extent—that if the commitment of the signer is not faithfully executed, there can be no recovery on the instrument. Cases are collected in an annotation in 75 A. L. R. 1389. See *Stout v. Eastern Rock Island Plow Co.* (Ind.), 176 N. E. 844; 75 A. L. R. 1386; *Smith v. Lagerstrom* (Sup. Ct. Cal. in Bank), 215 P. 2d 450; *Asbury Park Electric Supply Co. v. Megill* (Sup. Ct. N. J.), 133 A. 181; *Ogden v. Pope* (C.P.N.Y.), 18 N. Y. S. 140; *Union Trust*

---

2. Actually, it is said, for a lesser amount than was authorized since Plitt claims that when it was filled up, Kellam owed him $4,600 and interest on the Epstein note, and $5,200 and interest on the judgment, a total of more than $9,800, and the note was for but $9,500.

*Co. v. McCrum* (App. Div.), 129 N. Y. S. 1078, aff'd without opinion 101 N. E. 1124; *Hartington National Bank v. Breslin* (Neb.), 128 N. W. 659. See also *Beutel's Brannan on Negotiable Instruments Law,* sec. 14, page 350 (7th Ed.) ; Britton, *Bills and Notes,* Sec. 84, pp. 331-332; 29 Mich. L. Rev. 74.

We turn to the question of whether Plitt was a holder in due course. The courts have divided sharply on whether under the Negotiable Instrument Law a payee can be a holder in due course. Those that hold he cannot usually conclude after semantically analyzing various sections of the Negotiable Instrument Law: (a) that until the instrument has been transferred to the payee it cannot be regarded as a completed obligation; (b) the act requires that the instrument be "negotiated" to a holder before he becomes a holder in due course; and (c) since a "negotiation" cannot take place until after the instrument has become a complete obligation by transfer to the payee, the latter may not be considered a holder in due course. The cases supporting the doctrine that a payee may be regarded under the Negotiable Instruments Law as a holder in due course reason by a similar semantic analysis: that the Act's definition of "negotiation" (in Maryland, Code (1957), Art. 13, Sec. 51) is that a "negotiation" takes place when an instrument is transferred from one "person" to another and not from one "holder" to another, that the last sentence in the definition as to "negotiation" of order paper ("by the indorsement of the holder completed by delivery") is illustrative only and not all-inclusive and therefore, under some circumstances at least, negotiation may be accomplished by the mere transfer of physical possession of an instrument from one person to another. The two lines of decision are collected and discussed in annotations in 142 A. L. R. 489 and 169 A. L. R. 1455. Cf. *John Hancock Mutual Life Insurance Co. v. Fidelity-Baltimore National Bank,* 212 Md. 506.

It may be that a sound basis for distinction is that suggested in a full and scholarly consideration of the subject in Aigler, *Payees as Holders in Due Course,* 36 Yale L. J. 608. Professor Aigler suggests that a payee may acquire his rights in commer-

cial paper by purchase as well as by promise. He argues that a payee in the usual case, though he takes for value, does not purchase the instrument, since the value he gives is the consideration for the promise of him whose paper it is, not the purchase price; although thereafter the paper may be the subject matter of a purchase even by the named payee, if he deals with one actually or apparently the owner thereof.[3]

He points out that before the codifications in England and the United States the cases which treated the payee as a holder in due course were quite uniformly instances of the payee taking by purchase rather than by promise, and suggests a similar result under the Negotiable Instruments Law. He says (at p. 630) : "But reading the statute in the light of the common law and remembering that in a very large percentage of transactions the instrument in its inception comes to the payee as a promisee and not as a purchaser, would it not more reasonably be concluded that a payee is not entitled to the presumption unless it first appears that he took by purchase?" There is an excellent discussion of the question in Britton, *op. cit. supra,* Section 122. Perhaps it could be argued that, at least implicitly, *Blacker v. Bukowitz,* 219 Md. 171, is authority for Professor Aigler's view.

We see no need to decide the abstract question. There seems no disagreement, even in the cases holding that a payee can be a holder in due course that, on the facts, he may not be, and here we think Plitt took the note in question with knowledge of its limitations and infirmities and so, under Code (1957), Art. 13, Sec. 73, was not a holder in due course. There can be no doubt that Blacker was Plitt's agent and his knowledge, acquired in

---

**3.** "An instrument with a blank for the name of the payee may be issued to A and after passing through any number of other hands as the property of each successive party, may be filled in by X with his own name as payee. While X would appear as the promisee, the fact is he has taken as a purchaser and is clearly a remote party. So in the common case of a bill of exchange procured by a remitter in the name of his creditor, the payee, though ostensibly a party to the promise, really takes as a purchaser from the remitter and is, therefore, a remote party." *Ibid.,* pp. 621-622. Illustrative of similar situations are Flores v. Woodspecialties, Inc. (Cal.), 292 P. 2d 626, and Western Surety Co. v. Friederichs (Minn.), 63 N. W. 2d 565.

the course of the agency, was Plitt's knowledge, (*Baltimore American Ins. Co. v. Ulman,* 165 Md. 630, 638), since Blacker had no independent interest adverse to that of Plitt to prevent the working of the usual rule (*Lohmuller Bldg. Co. v. Gamble,* 160 Md. 534, 540).[4] Indeed, Blacker was, at the least, overzealous in attempting to get for Plitt more than Plitt was entitled to get, as in *Devries v. Shumate,* 53 Md. 211, cited earlier, where an agent of the payee retained notes delivered to him on a condition that had not been met and turned them over to the payee, without informing him of the facts. Judge Alvey said for the Court at page 215: "If the notes had been negotiated before maturity and passed into the hands of a *bona fide* holder for value, without notice, quite a different case from the present would have been presented. But the notes being still in the hands of the payees whose agent obtained them under the circumstances stated, these payees, as principals, are affected with all the knowledge acquired by the agent in the course of his employment, whether that knowledge was communicated to the principals or not; such knowledge being material to the transaction in which the agent was employed, and of facts which it was his duty to communicate. Evans, *Agency,* 230, 231. Therefore, in such case as this, the knowledge of the agent is the knowledge of the principal, and the latter cannot stand in a better position, in respect to the transaction in question, than he would if he had conducted the business in person instead of by agent."

It is clear to us that Plitt was not a holder in due course. See *McCosker & Molloy v. Banks,* 84 Md. 292; *Burke v. Smith,* 111 Md. 624; *United States v. Schaeffer,* 33 F. Supp. 547 (D. Md.); *Bowen v. Mt. Vernon Savings Bank* (D. C. Cir.), 105 F. 2d 796; *Tremont Trust Company v. Noyes* (Mass.),

---

4. The knowledge imputed to the principal is considered actual knowledge.

"Notice to the attorney, as well as notice to the deputy, was notice to the collector, and was actual, and not merely constructive notice to him, for the principal is bound by and affected with notice to his agent; and he is equally bound by notice received by his attorney in the same transaction." McSherry, J., for the Court in *Mayor, etc., of Baltimore v. Whittington,* 78 Md. 231, 238.

141 N. E. 93, 97; *Citizens National Bank of Greencastle v. Speck* (Super. Ct. Pa.), 164 A. 810; *State Bank of Pamplin v. Payne* (Va.), 159 S. E. 163. Compare on the facts *Sherwood Distilling Co. v. Peoples First National Bank & Trust Co.* (4th Cir.), 193 F. 2d 649.

Finding no sustenance for the appellant Plitt in any of the contentions he makes and no error below, the judgment appealed from will be affirmed. We do not express any opinion as to the rights of any of the parties with respect to the underlying obligations.

*Judgment affirmed, with costs.*