## The First Pennsylvania Banking and Trust Company v. Kritzberger

*Power, Bowen & Valimont*, for plaintiff.

*Biester & Ludwig, Benjamin S. Ohrenstein* and *William P. Thorn*, for defendants.

MONROE, J., September 6, 1963.—This is a proceeding to open a judgment by confession contained in a judgment note, being part of an installment sales contract, for the sale of food and a freezer by the payee of the note, Greater Premium Food Co., Inc., to defendants, the makers thereof. The note is dated December 8, 1960, and was assigned on the same day to the First Pennsylvania Banking and Trust Company, herein-

after referred to as Bank. It was entered of record as of the above court term and number on June 9, 1961. Defendants filed their petition to open the judgment on August 24, 1961, and a rule was granted on plaintiff to show cause why the judgment should not be opened. Plaintiff's answer was filed September 19, 1961. Depositions were then taken on behalf of defendants.

The issues raised by the pleadings are fraud in inducing the execution of the note, fraudulent filling of blanks thereon in excess of the authority granted.

In Laughlin v. McConnel, 201 Pa. Superior Ct. 180, at pages 183-84 (1963), it is stated:

"Fraud must be established by clear and satisfactory evidence, as it is never presumed. Davis v. Carbon County, 369 Pa. 322, 85 A. 2d 862; Pusic v. Salak, 261 Pa. 512, 104 A. 751. A party who relies on fraud to establish a claim has the burden of proving by clear and convincing evidence the facts upon which the alleged fraud is based. Bayout v. Bayout, 373 Pa. 549, 96 A. 2d 876. Fraud must be proved by more than a mere preponderance of evidence. Nothing short of evidence precise, clear, and indubitable can be allowed to overturn a written instrument. McCreary v. Edwards, 113 Pa. Superior Ct. 151, 172 A. 166.

"This rule in fraud cases that evidence must be clear, precise, and indubitable, means that witnesses must be credible, must distinctly remember the facts to which they testify, must narrate details exactly, and that evidence must be of such weight as to make out facts alleged beyond a reasonable doubt, thereby enabling the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Gerfin v. Colonial Smelting & Refining Company, Inc., 374 Pa. 66, 97 A. 2d 71."

Fraud is averred in the petition to open and admitted by the insufficiency of the answer thereto, under

Pa. R. C. P. 1029(b) (c). The material averments of the petition which are accepted as admitted are:

"3. That on or about November 22, 1960, Marvin Melaton the representative, agent or employee of the aforesaid Greater Premium Food Company, Inc., at defendants' residence, falsely stated, with intent to defraud, that defendants could purchase a freezer and their family food needs for the cost of their usual weekly food purchases. The said Marvin Melaton further represented that the average cost of the freezer and food to defendants would not exceed Ten Dollars ($10.00) or Eleven Dollars ($11.00) per week. The said representation was false and was intended to induce defendants to execute a judgment note in blank and deliver the same to the said Marvin Melaton.

"4. That the aforesaid Greater Premium Food Company, Inc., delivered a freezer and food to defendants the week following the week of November 22, 1960. Thereafter, on or about December 7, 1960, another representative of the aforesaid Greater Premium Food Company, Inc., whose identity is not known to defendants, called defendants on the telephone and stated that he was calling to confirm that a change in price for the freezer and food to defendants was Seventy-Two Dollars and Two Cents ($72.02) per month. Thereupon defendant, Clara I. Kritzberger, stated that she and her husband could not afford to pay that amount and that the aforesaid Marvin Melaton had stated that the cost of the freezer and food would not exceed Eleven Dollars ($11.00) per week. Thereupon defendant, Clara I. Kritzberger, told the aforesaid representative to cancel the order and pick up the freezer.

"5. That plaintiff's assignor, Greater Premium Food Company, Inc., filled in the amounts and figures that appear on the aforesaid judgment note, without authorization of defendants."

The testimony of defendants substantially corroborates the foregoing averments. Briefly, their testimony is that a person representing herself to be agent for the Greater Premium Food Co., or American Grocery Co., phoned to Mrs. Kritzberger inquiring whether she would be interested in a freezer-food plan and permit a salesman to speak to her. She expressed her interest. In the evening of November 22, 1960, Mr. Melaton met with defendants at their home, stating that he represented the American Grocery Company and that the food would be furnished by the Greater Premium Food Company, Torresdale Avenue, Philadelphia, Pennsylvania. Defendants told him that their budgeted costs for food was $10 a week, and that they were unable to afford a greater outlay. Melaton thereupon represented to them that his principal purchased food at wholesale rates from Greater Premium Food Co., and could and would supply defendants with their food requirements and sell them an 18 cubic foot freezer at a cost of $10 a week, and in no event for more than $45 per month, if they would contract for the food plan for a period of 36 months. He told them that he would phone to them the exact amount of the food cost as soon as it was determined. This he never did. Relying on the representations made by Melaton, defendants agreed to subscribe to the food plan.

Melaton presented to them for their signatures what appears to be a purchase agreement, D-1, and is a printed form of the American Grocery Co., dated 11/22. It contains many confusing longhand entries, strike-outs, and other markings. It contains, inter alia, irreconcilable entries inserted in the blank spaces therein, thus:

"ENTIRE HOME SUPERMARKET FACILITIES LISTED BELOW—

"Including Food . . . . . . . . . . . . . . $20.00 per week

"Food Cost Per month
   4 Payments @                    . .                $49.49
"Supermarket Services—Shelves
   Refrigeration, Insurance, etc.
      Cost Per Month
"36 Payments @                                       *$37.17*
"All Supermarket Facilities and Food
      Total Cost Per Month
      First 4 Month Period
"4 Payments @                                        *$86.66*
      "TOTAL COST              *$999.95*"
(Italics supplied, to indicate entries made)

Mrs. Kritzberger testified that she asked Melaton a number of times what the $37.17 figure represented before he impatiently answered that it represented the only figure they had to consider in making payment. The $20 figure he used for demonstration purposes, saying that if they purchased $20 of food a week, then the payments to be made would be represented by the other figures appearing upon the purchase agreement. The Kritzbergers told Melaton that they did not want to go over $10 a week, and he replied that if the food package came to $10.45 or $11 per week, and if he entered only $10 in the space occupied by the $20 figure, he would have to come back to get them to sign another agreement. Defendants signed the purchase agreement. It is to be observed that the sums entered hereon do not correspond with and are not reconcilable with the sums entered upon the installment sale contract, P-1.

.The installment sales contract, P-1, containing the confession of judgment, is dated "Dec. 8, 1960", but it was signed by defendants on the evening of November 22, 1960. The depositions do not disclose whether that date appeared on the contract at the time defendants executed it. Blanks in the note were not filled in at the time defendants executed it. Defendants testified that

the only amounts which Melaton was authorized to fill in was the cost of the freezer and the food, which together would not exceed $43 per month, and the finance charges. The evidence is sufficiently clear that the authority to fill the blanks was, while indefinite as to a precise amount, nevertheless, restricted to an amount that would enable the Kritzbergers, within a period of three years, to purchase their food and the freezer at a cost not exceeding their previous food budget or $45 per month. This authority was never increased or expanded by defendants. The entries made in the blank spaces cover a description of the freezer by make, model and serial number, the total charges for the freezer, the charges for the food, the sales tax and the aggregate of these items, the total principal amount financed, finance charge, and the total time balance, the number of monthly installments within which the time balance was to be paid and the amount to be paid monthly, and the due date of the first installment payment. At the time defendants signed the installment contract, November 22, 1960, Melaton might have known the make, model, charge for and sales tax upon the freezer, but it is highly unlikely that he then knew the serial number. He knew the amount of the finance charge. But he did not know the price of the food and, therefore, he could not have known or then computed the total cash price, the principal amount financed, the total time balance, or the amounts of the monthly installments. It follows, therefore, that the figures representing those items must have been entered on the contract and warrant of attorney at a later time.

Melaton did not furnish defendants with copies of the papers which they had executed on November 22, 1960.

On November 27, 1960, the freezer was delivered and a food economist phoned Mrs. Kritzberger and told her that the total monthly payment would be

$72.02. She was flabbergasted and told him that Mr. Melaton had said the payments would approximate $43 a month and, that was all that they could afford; he got someone else on the phone, whom she believed to be the president of the Greater Premium Food Company, to whom she explained the situation, and he said that he would have Melaton get in touch with her. A little while later, Mr. Melaton phoned to her. He said that he wanted her to give him a chance to prove himself, inferred that there was a mistake on the part of the economist, and then said he would personally guarantee and see that she got the difference between $43 and $72.02, to which she replied, that if that was the figure she would agree to it, and he stated that he would send it to her and that she could count on it. The Kritzbergers never heard from him again, although they tried to get in touch with him.

Sometime later another representative called upon Mrs. Kritzberger and quoted figures which did not agree with those of Melaton. She attempted to explain to him what Melaton had promised, and he replied, "Well, that's right, that's right." He then dropped the subject, so she assumed the figures would be the same as Mr. Melaton had agreed upon.

Mrs. Kritzberger was cross examined on a document, under the heading of the American Grocery Company, entitled "Customer's Contract Verification", P-2, bearing the date 11/30/60, containing her signature and the signature of her husband, reciting that the monthly payment for the freezer will be $37.17, for the food $49.49, with total payments of $86.66. The purpose of the cross examination was to establish that the paper was executed at the time this last representative called on Mrs. Kritzberger. She denied any knowledge of having signed that exhibit, conceded that she might have signed it on November 22, 1960, when Mr. Melaton was at the house, did not recall seeing the figures

thereon. The testimony establishes that the only time that Mr. Kritzberger signed any documents was on the evening of November 22, 1960, and that he was never home thereafter when any representative of the American Grocery Company or the Greater Premium Food Company visited the Kritzberger home. The inference is, therefore, that the exhibit was signed on November 22, 1960, in blank. An interesting coincidence is that the purchase agreement, D-1, and the customer's contract verification, P-2, are under the heading of American Grocery Company, but that name does not appear upon the installment sales contract containing the warrant of attorney, P-1. Instead the name of Greater Premium Food Co., Inc. appears in two places thereon by stamp or typing, yet Melaton represented himself to be an agent of the American Grocery Company.

In mid-December 1960, Kritzbergers received from plaintiff Bank a monthly installment payment book for the transaction. Mrs. Kritzberger immediately phoned to the bank, requested to speak to the person in charge of the transaction and was advised by a secretary that it was a Mr. Nicholas, who was not then available. Mrs. Kritzberger asked the secretary to have Mr. Nicholas call her promptly "because it was impossible to make these payments." She did not hear from Mr. Nicholas until after the first installment was in default, on January 8, 1961, at which time she recited to him her transactions with Melaton and advised that she could not and would not make the installment payments.

Plaintiff did not call as a witness Mr. Melaton, or the person who called upon Mrs. Kritzberger to confirm the prices, both of whom are referred to in defendants' petition. In effect, therefore, plaintiff concedes that a fraud was perpetrated. See Fidelity Trust Company v. Gardiner, 191 Pa. Superior Ct. 17, at page 24, where it is stated, referring to the person alleged to

have perpetrated the fraud upon defendants in that case:

"And it is a fact of much importance, in our view, that in the hearings on the rule in this case Alex DiSantis was not called as a witness by either Premier or by the bank. In effect therefore the plaintiff Trust Company concedes that a fraud was perpetrated but takes the position that a cloak of legal immunity protects it from all consequences of the fraud . . ."

We are, therefore, of the opinion that the pleading and depositions sufficiently establish fraud to justify us in opening this judgment and submitting the issues to a jury.

Counsel for plaintiff argued that it is incredible that the Kritzberger family could have lived on food expenditures of only $10 a week and that, having been informed by Melaton that the installment payment for the freezer would be $37.17 a month they could have believed that they would be supplied with their food requirements for only an additional $5.83 per month. This argument overlooks the fact that defendants' testimony presently stands undenied. It also overlooks Mr. Melaton's statement that because of the relationship between the American Grocery Co. and the Greater Premium Food Company, the food could be supplied at wholesale rates. It is conceivable that the Kritzbergers thought that a part of the food cost would be absorbed in the profit on the freezer, although there is no testimony to that effect. We are convinced that the Kritzbergers were deceived by the representations and relied upon them. Mrs. Kritzberger's conduct is consistent therewith. She insisted that Melaton contact her when the price of the food was finally determined, took issue with the food economist and the man who called to verify the prices when they quoted prices in excess of those represented by Melaton, asked that the contract be cancelled and the freezer picked up, and, when

Melaton phoned to her, agreed to go forward with the transaction only after he assured her she would get the difference between $43 and $72.02, phoned plaintiff Bank immediately upon receipt of the installment book and informed it of her inability to pay.

In Emery v. Third National Bank of Pittsburgh, 314 Pa. 544, 547 (1934), it is stated:

"This principle is laid down in 26 C. J., section 59, page 1142: 'It is held by the weight of authority that ordinarily representations are not actionable unless the hearer was justified in relying thereon in the exercise of common prudence and diligence. But the respective character, intelligence, experience, age, and mental and physical condition of the parties are considerations which may vary this rule or render it of small importance, and the rule has been judicially stated in a form recognizing its limitations.' "

Although both Kritzbergers are high school graduates and Mrs. Kritzberger had at least attended college, she is a housewife and, at times nurses, and he is a postal clerk. He is 35 years of age. Her age is not stated. At the time of the transactions stated herein, defendants were the sole members of their household. We find nothing in this evidence alone which would warrant us in saying that defendants were not justified in relying upon Melaton's representations. A high school education, administering to the ill, conducting a household, and the handling of the mails in a rural post office, of themselves, are not evidence of business acumen and caution in dealing with an unscrupulous salesman. Apropos of this, Emery v. Third National Bank of Pittsburgh, supra, additionally has this to say, page 547:

"In 12 R. C. L., section 113, page 359 is stated this principle: 'In addition to actual reliance, a party asserting fraud of a false representation must have had the right to rely thereon; wherefore the representation

must have been made to him either directly or indirectly, and must have been of such a nature that it was reasonably calculated to deceive him, and to induce him to do that which otherwise he would not have done. The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has obvious dangers. But judicial experience exemplifies that the former is the less objectionable, and hampers less the administration of pure justice. The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked. . . . Where the means of obtaining information are not equal, the positive representations of the person who is supposed to possess superior means of information may be relied on."

And in Lake v. Thompson, 366 Pa. 352, 360 (1951):

"The law leans toward protecting even the foolishly credulous against the machinations of those who would defraud."

There is an additional reason why we should open this judgment. The Uniform Commercial Code, Act of April 6, 1953, P. L. 3, sec. 3-407, as amended October 2, 1959, P. L. 1023, 12 A. PS §3-407 provides:

"(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in

. . .

"(b) an incomplete instrument, by completing it otherwise than as authorized;. . .

"(2) As against any person other than a subsequent holder in due course

"(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense; . . ."

In 75 A. L. R. 1390 it is stated:

"The general rule, under the law merchant, as stated in 3 R. C. L. 875, is that, while the delivery of a negotiable instrument containing a blank space for any of the material elements thereof implies authority to fill up such blank in anyone into whose hands it may come, the blank must be filled in accordance with the implied authorization, or the instrument will be rendered invalid as to the parties and others having notice."

See also Lincoln Deposit & Trust Co. v. Sanker, 305 Pa. 576 at page 582, quoting section 14 of the Negotiable Instrument Law, Act of May 16, 1901, P. L. 194.

As we have pointed out above, a blanket authorization was not given to Mr. Melaton or the American Grocery Company or the Greater Premium Food Company to fill the blanks in an unrestricted amount. The extent of the authorization was to fill the blanks upon the note in the amount of the cost of the freezer, the cost of the food, together not to exceed $43 per month, and the finance charge. This authority was never increased or expanded by defendants. They never assented to the ultimate amount of the installment sales contract. We conclude, therefore, that the Greater Premium Food Company and/or American Grocery Company, or its or their representative, Melaton, did not fill in the blanks in accordance with the authority given, but exceeded such authority and by so doing materially altered the instrument. See 75 A. L. R. 1390 and cases there cited: Massey to use v. Massey, 267 Pa. 239 (1920); West Suburban Motor Sales v. J. A. Harvey, 272 Ala. 594, 133 So. 2d 250; Plitt v. Kellam, 222 Md. 383, 160 A. 2d 615; Commercial Auto Loan Corporation v. Baker, 73 Ga. App. 534, 37 S. E. 2d 636; and A. A. Murphy, Inc. v. Banfield, 363 P. 2d 942 (Okla.) (which factually, is quite similar to the case before us). In so altering the instrument a fraud was committed upon defendants in addition to the fraud

perpetrated upon them by Melaton at the inception of the transaction.

On the present state of the record, plaintiff is not a holder in due course of the installment sales contract. The Uniform Commercial Code of 1953, sec. 3-307, as amended, 12 A. PS §3-307 provides:

. . .

"(3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course."

The pleadings and depositions establish that defenses exist to the installment sales contract containing the warrant of attorney to confess judgment. Defendants' depositions do not establish that plaintiff is a holder in due course under the definition thereof in the Uniform Commercial Code, sec. 3-302. Plaintiff did not take depositions on its own behalf. Plaintiff has not met its burden of proof. Therefore, for the purposes of the disposition of the rule presently before us, plaintiff holds the instrument subject to the defenses thereto which defendants can raise against the payee. Compare Budget Charge Accounts, Inc. v. Mullaney, 187 Pa. Superior Ct. 190 (1958), First Pennsylvania Banking and Trust Co. v. DeLise, 186 Pa. Superior Ct. 398 (1958).

Plaintiff argues that because its answer to the petition to open alleges that it is a holder in due course and because defendants have taken no depositions in respect thereof, defendants have, under Pa. R. C. P. 209, admitted the allegation, and, therefore, plaintiff holds the instrument free of the defenses raised. Under the rule, it is only "averments of fact responsive to the petition and properly pleaded in the answer" that are deemed admitted by failure to take depositions. Therefore, if plaintiff's allegation that it is a holder in due course is construed to be a conclusion of law, there is no admis-

sion thereof by defendants' failure to take depositions in respect thereof. And, if it is construed to be an allegation of fact, it is not, as contained in plaintiff's answer, a traverse of the averments of defendant's petition, but, rather, an affirmative defense thereto and properly should have been pleaded in compliance with Pa. R. C. P. 1030, under the heading of "new matter". Not having been so pleaded, the averment is not admitted. Compare Kine v. Forman, 404 Pa. 301, 304, 305 (1961), where the converse of this conclusion was reached on the facts therein pleaded.

After reciting that the buyer acknowledges notice of the seller's intention to assign the contract to plaintiff Bank, the installment sales contract provides that the buyer "will not assert against Bank any claim or defense which Buyer may have against Seller". No evidence having been produced to establish that plaintiff is an assignee for value, in good faith and without notice of claim or defense, the quoted statement is not, for the purpose of disposition of the rule presently before us, enforceable by the plaintiff: Uniform Commercial Code sec. 9-206, 12 A. PS §9-206.

In view of the foregoing, we are of the opinion that defendants have established the existence of meritorious defenses: and we believe that the ends of justice will be best served by opening this judgment generally, requiring plaintiff to allege and prove any causes of action it may have on the merits just as though it had commenced an action of assumpsit; and permitting defendants to answer and offer any defenses they may have thereto.

### Order

And now, September 6, 1963, it is ordered and directed as follows:

1. That the rule heretofore issued to show cause why the within judgment should not be opened and defendants let into a defense be, and is hereby, made absolute.

2. That an issue be framed between plaintiff and defendants to determine the amount, if any, due and owing upon the judgment note within mentioned and such other rights as plaintiff may have, which issue shall be created by the filing by plaintiff, in accordance with Pa. R. C. P. 1001, et seq., of a complaint, and the filing by defendants of an answer, and the filing of such other pleadings as may be authorized by said rules and the circumstances of the case, and that the matter be ultimately disposed of as though suit had originally been commenced as an action of assumpsit.

3. That the provisions of Pa. R. C. P. 1037 (a) shall be available to defendants if plaintiff fails to file a complaint.