# Richmond

AMERICAN REALTY TRUST

V.

THE CHASE MANHATTAN BANK, N.A., ET AL.

September 11, 1981.

Record No. 790637.

Present: Carrico, C.J., Cochran, Compton, Thompson, and Stephenson, JJ.

394

*James M. Thomson (Thomas S. Schott; John F. Rutledge; Thomson, Pikrallidas & Schott,* on briefs), for appellant.
*Arthur B. Vieregg, Jr. (Grayson P. Hanes; John J. Sabourin, Jr.; Hazel, Beckhorn & Hanes,* on brief), for appellees.

CARRICO, C.J., delivered the opinion of the Court.

This litigation began in March, 1976, with the filing by Arlington Ridge Road Associates (Arlington) of a "Petition for Injunction and Monetary Damages" against American Realty Trust (American), Chase Manhattan Bank, N.A. (Chase Bank), and Chase Manhattan Mortgage and Realty Trust (Chase Trust).[1] In the petition, Arlington sought compensatory and punitive damages against the respondents for their alleged mishandling of the funding of The Representative, a condominium project in Arlington County. Arlington sought also an injunction against the foreclo-

---

[1] Where the context permits, the singular designation, "Chase," will refer to Chase Bank or Chase Trust or the two collectively.

sure of a deed of trust held by Chase Bank on The Representative property. By order entered March 31, 1976, the trial court temporarily enjoined the foreclosure.

In early June, 1976, on Arlington's motion, the trial court dissolved the injunction. On July 2, The Representative property was sold at foreclosure to Representative, Inc., Chase Bank's wholly owned subsidiary formed to acquire the property.

Thereafter, the proceeding below was transferred to the law side of the court. Arlington then filed an amended motion for judgment against American, Chase Bank, Chase Trust, and Representative, Inc., seeking compensatory and punitive damages for the defendants' allegedly improper actions in handling the funding of The Representative project and in foreclosing the deed of trust. American filed a cross-claim for damages against Chase Bank and Chase Trust for their allegedly wrongful conduct concerning the funding and foreclosure of the project. In turn, Chase Bank filed a counterclaim against Arlington and a cross-claim against American for damages resulting from Arlington's and American's alleged fraud and breaches of loan agreements.

Before trial, Arlington, Chase Bank, and Chase Trust resolved their differences. As a result, Arlington dismissed its action against all defendants and Chase Bank dismissed its counter-claim against Arlington.

American's and Chase Bank's cross-claims against each other were tried before a jury from mid-November to mid-December, 1978. The jury returned a verdict of $2 million in favor of Chase on its cross-claim against American. On January 22, 1979, final judgment was entered on the verdict. American was awarded an appeal. Chase has assigned cross-error.

The Representative occupies a 3.77-acre parcel of land, known as the Campbell Tract, located on South Arlington Ridge Road in Arlington County. In the early 1970s, Thomas J. Broyhill, president of American, became interested in the tract as a prime site for condominium development. Because, however, American might lose tax preferences it enjoyed as a real estate investment trust if it developed the land, Thomas Broyhill sought the participation of his cousin, Joel Broyhill, then a member of Congress, and John DeLuca, a general contractor.

Thomas Broyhill proposed that American, Joel, and DeLuca enter into a joint venture agreement whereby American would acquire the Campbell Tract and provide the funds necessary to con-

struct a high-rise condominium. Joel and DeLuca would build the structure and market the finished units, but neither would contribute any personal funds. From the sale proceeds, American would be repaid the funds it advanced, plus interest. From anticipated profits of $3 million, American would receive the first $1 million and Joel and DeLuca would share equally in the remainder.

Joel and DeLuca accepted Thomas Broyhill's proposal and formed Arlington, a Virginia limited partnership, to carry out their portion of the undertaking. In December, 1971, American acquired a one-half interest in the Campbell Tract, and Thomas Broyhill advised DeLuca that American had agreed to fund the project. Believing American had acquired whole ownership of the tract, DeLuca secured the necessary permits and prepared to proceed with construction. He soon learned, however, that American owned only a one-half interest in the tract; the remainder was held by two sisters, Mrs. Wright and Mrs. Killmaster.

Eventually, Thomas Broyhill reached an understanding with Mrs. Wright and Mrs. Killmaster. The sisters agreed to convey their interest in the Campbell Tract in exchange for the conveyance to them by American of an apartment site located in Williamsburg. The two sisters agreed further to contribute the Williamsburg parcel to Parkway Associates Limited Partnership, with the sisters as limited partners owning a one-half interest and DeLuca as general partner holding the other half. Using funds to be provided by American, DeLuca agreed to build an apartment complex on the site. As part of the understanding, American, DeLuca, and Parkway Associates guaranteed the two sisters an annual income of $40,000 protected from adverse tax consequences.

Pursuant to the foregoing agreement, American acquired full title to the Campbell Tract, and, in the early fall of 1973, DeLuca commenced construction of both the Arlington County and the Williamsburg projects. Although Thomas Broyhill had assured Joel and DeLuca that American had sufficient funds to finance both projects, in late 1973, American experienced cash-flow problems and recognized its inability to provide full funding for the construction of The Representative.

Seeking a solution to the cash-flow problems, Thomas Broyhill contacted Chase Bank and proposed that the bank lend $10 million for American's use in funding construction of The Representative. While Chase Bank approved the project, it proposed that

Chase Trust provide the funds and that the loan be made directly to Arlington. Accordingly, on January 7, 1974, Chase Trust issued a commitment letter agreeing to lend Arlington $10 million at an interest rate of "3-½% above the prime rate from time to time charged by The Chase . . . Bank." The commitment was contingent upon proof that all construction costs "in excess of $10,000,000 shall have been provided by American" and upon Joel Broyhill and his wife and DeLuca and his wife furnishing a guaranty for the repayment of the loan.

Following a receipt of the commitment letter, Joel and DeLuca protested to Thomas Broyhill the requirement for a personal guaranty, with Joel stating he would withdraw from the project unless he was indemnified by American. Thomas assured Joel and DeLuca that their guaranty would last only "a short period of time" because Chase would be taken "out of the deal" as soon as American marketed certain debentures. In any event, Thomas agreed that American would indemnify Joel and DeLuca against any loss and would also "guarantee the Chase loan."

On February 20, 1974, Thomas, on behalf of American, and Joel and DeLuca, on behalf of Arlington, executed an agreement embodying the particulars of their undertaking concerning construction of The Representative and the division of proceeds from the sale of its units. In one place, the contract stated that American had "agreed to act as one of the guarantors of the repayment to Chase . . . Trust of the construction loan." In another part of the contract, American stipulated, *inter alia*, that it would "execute any loan guaranty, together with [Joel and DeLuca], as may be required by Chase . . . Trust to fund the construction loan."

In connection with the closing of the Chase loan, American leased to Arlington, under a "Ground Lease," the site of The Representative project. Then, on February 25, 1974, four other documents were executed by the various parties, (1) a "Co-Lending Building Loan Agreement," executed by Chase Trust, American, and Arlington, (2) a deed of trust, executed by Arlington, as "Borrower" and "owner of the leasehold interest" in the project site, and by American, as "Grantor" and owner of the site, (3) a promissory note in the sum of $13.2 million executed by Arlington and payable to Chase Trust, and (4) a guaranty agreement executed by Joel Broyhill and his wife, DeLuca and his wife, and American.

The building loan agreement reflects the undertaking of the parties that Chase Trust would advance $10 million and American $3.2 million for construction of The Representative, with each loan advance funded jointly by the co-lenders; that Chase Trust was to administer the loan, but the note representing the indebtedness was not to be sold without American's consent; that the co-lenders were to share interest ratably; that Chase Trust was to receive 85% of the proceeds of the sales of condominium units to apply on its indebtedness; and that Chase Trust would be "trustee for [American's] benefit of its proportionate share" of any loan proceeds.

On March 12, 1974, Chase Trust made the first loan advance under the building loan agreement. At its request, American was reimbursed from the first advance a net amount of approximately $719,000 for prior payments purportedly made for construction costs of The Representative.

Joint funding of the project by Chase and American proceeded without apparent problems until August, 1974. At that time, American indicated it was unable to continue providing its share of the funding, and Chase commenced funding the entire loan advances. Then, on July 1, 1975, the building loan agreement was modified to provide that Chase would fund the balance of American's contribution, that Chase's commitment would be increased accordingly to $12,259,648.48 and American's decreased to $940,351.52, and that Chase would be repaid its principal and interest in full before American was paid.

In October, 1975, Chase Trust sold Chase Bank $160 million in loans, including the loan on The Representative. Before assigning its interest, Chase Trust secured American's consent.

By February, 1976, The Representative was "basically complete." Although only $313,000 in loan proceeds remained undisbursed, DeLuca advised Chase that $700,000 was owed to subcontractors and further that "there were substantial cash needs to pay for the general maintenance, operating, security guards, [and] electricity . . . in order to sell the units."

Chase requested Thomas Broyhill and DeLuca to devise within seven days a plan "to pay for all these construction bills and ongoing expenses," but no plan was presented. The loan came due March 1, 1976. When the amount due was not paid, letters of default and demands for payment were sent to Arlington, American, Joel Broyhill and his wife, and DeLuca and his wife. With

the demands unsatisfied, The Representative was sold at foreclosure on July 2, 1976, for $12 million. The property was conveyed to the foreclosure purchaser, Representative, Inc., on September 6, 1976. Representative, Inc., then completed the project and marketed the condominium units. At the time of the trial below, only two of the 206 units remained unsold.

As indicated previously, Chase Bank's cross-claim against American was based upon American's alleged breach of the loan agreements, specifically, the building loan agreement and the guaranty, and upon American's alleged fraud and deceit in connection with the procurement of the Chase loan and the handling of loan proceeds. In support of its fraud charge, Chase relied upon evidence that American had concealed its role as a joint venturer with Arlington in the construction of The Representative; that American had concealed a $91,000 overpayment it received in the first loan advance; and that American had misrepresented it had paid subcontractors on The Representative project, thus concealing earlier diversions of loan proceeds for American's benefit.

These alleged diversions, totaling some $768,000, figured prominently in the evidence below. Of the total, the amount of $400,000 was diverted to the Williamsburg project, in which American and DeLuca were involved. DeLuca testified he would request funds from the Chase loan for costs ostensibly related to The Representative project and then use the the money for construction of the Williamsburg complex. The $368,000 portion was diverted to what Chase calls a " 'round-robin' scheme" involving Virginia Hotel Management, a corporation in which the children of American officials, including Thomas Broyhill, had substantial financial interests. As Chase describes the scheme, American took money it received from Chase for construction costs of The Representative and paid the money to Arlington with the understanding Arlington would lend the proceeds to Hotel Management to pay an indebtedness it owed American. This plan enabled American to remove the indebtedness from its books and to improve the appearance of a prospectus it planned to use in connection with a proposed bond issue. Although Hotel Management ultimately repaid the money, Chase says the scheme resulted in "$368,000 being withheld from [The Representative] project for one and a half years."

## I.

█ American contends first that the trial court erred in admitting into evidence two letters written to John DeLuca by Arlington's tax attorney, Wayne Johnson. The letters reflect Johnson's evaluation of the rights and duties of Arlington and American arising from the joint venture in which they were involved for the construction of The Representative. The focus of the letters was upon the alleged diversions of Chase loan proceeds to Virginia Hotel Management and the Williamsburg project. American's objections to the introduction of the letters were based upon grounds of hearsay and relevance.

Chase argues that, if admission of the letters was error, the error was harmless. We agree with Chase. Innumerable pages of the record deal with the joint venture between Arlington and American, and with the alleged diversions of loan proceeds, in all the particulars, nuances, and ramifications of those subjects. The letters in dispute were introduced only after Wayne Johnson himself had testified at length concerning the same subjects. Under these circumstances, we do not believe the addition of the letters themselves to the voluminous mass of evidence could have had any real impact upon the ultimate outcome of the case. Accordingly, we hold that admission of the letters does not constitute reversible error.

## II.

█ As noted previously, American signed the deed of trust securing the indebtedness due Chase Trust on The Representative property and also executed the guaranty agreement for the repayment of the indebtedness. American's next contention concerns a provision of the deed of trust which, American says, limits its liability under the guaranty.

The deed of trust is on a printed form, but it contains several typewritten portions, including § 1.19:

Anything to the contrary notwithstanding, it is understood and agreed that [American]

(a) shall not be personally liable for the performance of any of the covenants made by [American] herein, nor be charged in any way with any obligation for the payment of the Note or any part thereof, nor shall any property of

[American], other than the Mortgaged Property, be subject in any way to this Deed or to any judgment or decree obtained hereunder . . . .

The guaranty also appears to be on a printed form, but with certain typewritten portions. One of the printed sections provides that "[e]ach of [the guarantors] unconditionally guarantees to [Chase Trust] and to any purchaser of the Note from [Chase Trust], the due performance and prompt payment . . . of all of Borrower's obligations under the Note, the Mortgage, and the Building Loan Agreement."

The trial court ruled that the terms of the guaranty should be given effect, notwithstanding the apparent conflict between the provisions of the guaranty and those of § 1.19 of the deed of trust. The trial court made this ruling in refusing proposed Instruction R, offered by American, which would have told the jury:

[B]y Section 1.19 of the Deed of Trust, Chase Bank limited its right to damages against [American] to [American's] interest in the Campbell Tract (the parcels of land on which The Representative was built). The property was acquired by Chase Bank on September 6, 1976 as a result of the foreclosure sale on July 2, 19[76].

[Even if] the jury believes by a preponderance of the evidence that Chase Bank is entitled to relief by reason of a breach by [American] . . . the jury shall find a verdict for [American].

American contends its contractual rights and duties vis-a-vis Chase were defined in the four basic documents involved in this case, *viz.*, the building loan agreement, the deed of trust, the note, and the guaranty. These documents were executed contemporaneously as part of a single transaction, American says, and must be construed together. Furthermore, American states, because Chase's counsel prepared the documents, any ambiguity therein should be construed against Chase. When the documents are interpreted according to these rules of construction, American opines, the limitation contained in § 1.19 of the deed of trust is made consistent with the terms of the guaranty and "it [becomes] evident that Section 1.19 limits the liability of [American] under the Guaranty . . . to its interest in the Campbell Tract."

We do not agree with American's conclusion. Admittedly, "where parties have entered into more than one document relating to a business transaction, 'these documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others.' " *J. M. Turner & Co.* v. *Delaney,* 211 Va. 168, 171, 176 S.E.2d 422, 425 (1970). And it is a familiar legal maxim that ambiguous contractual provisions are construed strictly against their author. *Russell Co.* v. *Carroll,* 194 Va. 699, 701, 74 S.E.2d 685, 687 (1953).

Although contractual provisions may be subject to a rule of strict construction, the intention of the parties is the controlling factor. *Traylor* v. *Holloway,* 206 Va. 257, 260-61, 142 S.E.2d 521, 523 (1965). General rules of construction, therefore, should not be applied mechanistically, with the result that the intention of the contracting parties is thwarted. *Worrie* v. *Boze,* 191 Va. 916, 924-25, 62 S.E.2d 876, 880 (1951). Furthermore, any interpretation adopted by the court must be reasonable and just. *Southwest Virginia Hospitals* v. *Lipps,* 193 Va. 191, 205, 68 S.E.2d 82, 90 (1951).

In searching for that interpretation of ambiguous contractual provisions which reasonably reflects the parties' intention, the court may resort to extrinsic evidence, especially evidence indicating the practical construction the parties give the provisions. "When the terms of an agreement are doubtful or uncertain, the interpretation placed thereon by the parties themselves is entitled to great weight and will be followed if that may be done without violating applicable legal principles." *Dart Drug* v. *Nicholakos,* 221 Va. 989, 995, 277 S.E.2d 155, 158 (1981), quoting *L. O'Quinn, et al.* v. *P. Looney, et al.,* 194 Va. 548, 552, 74 S.E.2d 157, 159 (1953).

In this case, we face, as the trial court faced, two alternatives. We can adopt Chase's argument and hold that American's liability under the guaranty is not limited by the provisions of § 1.19 of the deed of trust. This approach, of course, would virtually eliminate from consideration the provisions of § 1.19. On the other hand, we can adopt American's argument and hold that the terms of the guaranty are superseded by the provisions of § 1.19, with the result that American's liability would be limited to "its interest in the Campbell Tract." This action, obviously, would virtually expunge the word "unconditionally" from the language "each of

[the guarantors] unconditionally guarantees . . . the . . . prompt payment . . . of . . . the Note."

The trial court resolved the dilemma by ruling that the parties, in § 1.19 of the deed of trust, could not have "intentionally made the guaranty meaningless, just wiped it out." We agree with the trial court. We believe it would be both unreasonable and contrary to the intention of the parties to hold that American's execution of the guaranty was a fruitless act.

As Chase points out on brief, the parties, by their conduct both before and during trial and by the practical construction they placed upon the contractual documents, demonstrated they "clearly considered the Guaranty to expose [American] to broad, potential liability," unlimited by the provisions of § 1.19 of the deed of trust. With respect to pretrial conduct, the record shows that, when Chase Trust's commitment letter was received by Arlington, Joel Broyhill and DeLuca protested to Thomas Broyhill, president of American, the requirement for a personal guaranty, and Joel threatened to withdraw from The Representative project unless he was indemnified by American.

Joel's recalcitrance was eliminated by Thomas Broyhill's promise that American would not only indemnify Joel and DeLuca but also "guarantee the Chase loan." This promise was incorporated into the contract executed by American, Joel, and DeLuca on February 20, 1974. The contract unconditionally stated that American had "agreed to act as one of the guarantors of the repayment to Chase . . . Trust of the construction loan" and that American would "execute any loan guaranty, together with [Joel and DeLuca], as may be required by Chase . . . Trust to fund the construction loan." This latter promise was implemented by the inclusion of the "unconditionally guarantees" language in the guaranty agreement that American executed February 25, 1974.

With respect to American's conduct during the trial below, the record shows that, in opening statement to the jury, American's counsel tacitly admitted his client's guaranty was unconditional. Counsel's argument proceeded on the theory American was not liable on the guaranty because Chase had breached the building loan agreement by foreclosing its deed of trust. At one point, counsel told the jury that American had attempted to induce Chase not to foreclose and to allow American to sell out The Representative project. In this connection, counsel stated: "The bottom line was, if they [Chase] followed what we [American] asked

them to do, we were responsible for it anyway because we were guarantors on the loan." At another point, counsel related to the jury that American had told Chase: "We [American] may lose [our investment] anyway, but you're taking a course that is bound to do it. If you take our course and you lose it, we are guaranteeing it. You can't come out short anyhow."

On the witness stand, Thomas Broyhill, American's president, admitted he had allayed Joel Broyhill's concerns about a personal guaranty with these statements: "Well, what difference does it make to you? [American is] guaranteeing the loan. [American] guaranteed it to Chase also." At another point in his testimony, Thomas admitted further he "had told the Chase people [American] would guarantee the loan."

In closing argument, American's counsel again expounded the theory his client was not liable under the guaranty because Chase had committed the first material breach of the loan documents. Counsel reiterated American's efforts to induce Chase not to foreclose its deed of trust. Counsel said:

> At the bottom line, Chase couldn't lose. We [American] were guarantor on the loan. If they rode with us at this request, if they lost money on doing what we asked them to do, they still had John DeLuca and Joel Broyhill and their wives and American Realty Trust as guarantors on the loan. I only say that because it goes to the unreasonableness with which Chase approached the sellout on this building.

In objecting to the refusal of Instruction R, American's counsel asserted the ground that his client's "obligations under the guarantee are limited by 1.19 of the deed of trust." This ground, however, was inconsistent with the theory American's counsel advanced before the jury during both opening statement and closing argument. The ground was also inconsistent with written documentation, oral testimony from Chase's witnesses, and testimonial admissions of American's president, all unchallenged and all showing the parties never intended the guaranty to mean anything other than what it said, *viz.*, that each guarantor unconditionally guaranteed Chase the prompt payment of the note executed by Arlington. Accordingly, it was not error for the trial court to refuse Instruction R.

## III.

■ American's next contention concerns Instruction No. 19, granted at Chase's request. The instruction reads:

> The Court instructs the jury that a joint venture exists when two or more persons combine in a joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management. The requirement of a right to joint control does not preclude the delegation of management duties to one of the joint venturers. If you find the agreement between [American] and Chase Trust, and subsequently Chase Bank, to provide funds for a construction loan to [Arlington] to be a joint venture, then [American] owed a fiduciary duty to Chase Trust and Chase Bank to disclose all material facts relating to the loan for The Representative project.

American contends it was error to grant this instruction. American does not object to the form of the instruction or challenge the sufficiency of the evidence to support a breach of the fiduciary duty enunciated therein, if the duty exists. Rather, American's complaint goes to the sufficiency of the evidence to support the existence of a joint venture between American and Chase.

Citing *Smith, Adm'r* v. *Grenadier*, 203 Va. 740, 744, 127 S.E.2d 107, 110 (1962), American says an essential element of a joint venture is that each co-venturer "have a voice in its control and management." Here, American maintains, "there was absolutely no evidence in the record that [American] had any 'voice in management or control'"; to the contrary, in the building loan agreement, Chase agreed to act as "agent for [American] for the purpose of the consummation of the Loan and its administration" and to serve as "trustee for [American's] benefit of its proportionate share" of loan proceeds. There was no basis, therefore, American concludes, upon which to instruct the jury that American owed Chase a fiduciary duty.

We need not decide whether the relationship between American and Chase constituted a joint venture. We agree with Chase that, if the granting of an instruction embodying the concept of joint venture was error, it was harmless error.

There can be no doubt that, from the building loan agreement, there arose a legal relationship between American and Chase as co-lenders. In this relationship, the parties were obligated to share the funding of The Representative, although in varying amounts. They were both interested, albeit in varying degrees, in the same things—the security of their loan and the ultimate repayment of their financial investments. To protect these mutual interests, American and Chase owed each other a reciprocal duty founded in trust and confidence which, after all, are the foundation stones of a fiduciary relationship.

American argues that the building loan agreement designated Chase Trust as its agent and trustee and thereby created a one-way fiduciary duty running only from Chase to American. We believe, however, that the fiduciary duty was a two-way proposition. Indeed, in Instruction No. 5, granted below at the request of Chase, the trial court delineated the reciprocal nature of the fiduciary duty springing from the relationship between American and Chase as co-lenders. The instruction reads:

> The Court instructs the jury that if the jury finds [American] breached its fiduciary obligation to Chase Trust, or Chase Bank as a co-lender, the jury must find that Chase Trust and Chase Bank were relieved of further performance under the loan documents.
>
> The Court instructs the jury that if the jury finds Chase Bank or Chase Trust breached its fiduciary obligation to [American] as a co-lender, the jury must find that [American] was relieved of further performance under the loan documents.
>
> Any such breach, in order to relieve the other party of further performance, must have been material and a cause of damage to the other party.

Instruction No. 5 is unchallenged on appeal. American cannot claim successfully, therefore, that prejudicial error resulted from the trial court's action in telling the jury reciprocal fiduciary obligations arose from the relationship between American and Chase. To permit the jury to label the relationship a joint venture, as permitted by Instruction No. 19, did not enlarge upon or otherwise change the nature of the fiduciary obligations arising from

the relationship. Accordingly, the granting of Instruction No. 19 does not constitute reversible error.

## IV.

■ As noted previously, on July 1, 1975, American and Chase modified the building loan agreement to accommodate the changes resulting from American's inability to continue providing its share of the funding of the construction costs of The Representative. In essence, the modification provided that Chase would fund the balance of American's contribution and that Chase would be repaid in full before American was paid.

During consideration of instructions below, the trial court refused American's proposed Instruction M:

> The court instructs the jury that all breaches by all parties prior to July 1, 1975 were exeused [sic] and waived in the July 1, 1975 modification agreement. Therefore, no action by any party prior to July 1, 1975 gives raise [sic] to a breach or default under the modified agreement.

American argues that one of the critical issues in the case was the timing of the first breach of the loan documents. Without Instruction M, American asserts, the jury might have concluded erroneously that American committed the first breach in August, 1974, when it failed to meet its funding commitments under the building loan agreement. Chase's counsel conceded below, American says, that Chase "probably . . . waived any default that went before" the modification. Instruction M was necessary, American opines, to place before the jury American's interpretation of the modification agreement and Chase's concession concerning the modification.

As Chase points out, however, Instruction M was overly broad in its possible application to the facts of the case. Under the instruction, American could have been absolved not only of a breach of the building loan agreement for its failure to meet its funding commitment in August, 1974, but also of its allegedly fraudulent pre-July 1, 1975 actions in diverting Chase loan proceeds from The Representative project. Furthermore, Instruction M would have conflicted with other instructions that placed no limitations upon Chase's right to recover for fraud occurring before July 1,

1975. It was not error, therefore, for the trial court to refuse Instruction M.

## V.

■ In its final contention, American argues that the $2 million verdict returned by the jury is excessive. Under the evidence presented by Chase, American asserts, "the largest permissible verdict is $998,149."

At trial below, Chase and American differed sharply concerning the proper approach to the question of damages. Chase took the position that damages should be fixed in the amount of the loan deficiency resulting from the foreclosure on September 6, 1976. American argued that damages should be ascertained as of the time of the final sellout of The Representative project. Construing the provisions of the building loan agreement, the trial court accepted American's argument and granted Instruction P, which reads:

> The Court instructs the jury that, if they should find for Chase Bank on either count, the jury should consider, in determining the damages, if any, to which Chase Bank is entitled: (1) the amount of unpaid principal advanced and the unpaid interest and other reasonable costs expended pursuant to the Co-Lending Building Loan Agreement less (2) the net proceeds to Chase Bank from the sale of condominium units and garage spaces and the other income derived by Representative, Inc.
>
> In determining "net proceeds", the jury should consider only reasonable costs expended in connection with the maintenance, repair, completion and sale of The Representative.

Employing figures from Exhibit No. 719, prepared by Loren Smith, an accounting expert called by Chase, American says the amount of $2,391,149, purporting to be Chase's deficiency, "is the foundation upon which the highest Chase Bank damage figure should be calculated." From this "foundation" amount, American opines, there should be deducted $1,147,000, representing American's portion of principal and interest, and $246,000, claimed by

Chase for "end-loan losses," not properly recoverable.[2] American's computation follows:

|  |  |  |
|---|---|---|
| 1. Construction loan balance (includes both Chase's and American's contributions to principal) |  | $12,886,706 |
| 2. Interest to date of foreclosure (includes interest due both Chase and American) |  | 1,895,485 |
| 3. Interest on deficiency ($3,007,332) from foreclosure to date in mid-trial |  | 839,672 |
| 4. Expenditures, including costs of completing The Representative |  | 5,361,939 |
| 5. Total costs and expenses |  | $20,983,802 |
| 6. Less — net proceeds of sales of condominium units |  | 18,592,653 |
| 7. Excess of costs over proceeds |  | 2,391,149 |
| 8. Less — principal advanced by American, plus interest | 1,147,000 |  |
| —end loan losses | 246,000 | 1,393,000 |
| 9. Maximum amount recoverable by Chase |  | 998,149 |

American opines that the jury's verdict of $2 million, "well over twice [the maximum] figure" shown in the above computation, "allows but one conclusion—the jury misconstrued the facts and/or the law." American maintains, therefore, that the trial court should have exercised its supervisory power over the verdict and ordered either a new trial or a remittitur.

Citing *Southern Mut. Ins. Co.* v. *Trear*, 70 Va. (29 Gratt.) 255, 261-62 (1877), Chase argues the verdict "must be upheld if there is sufficient evidence in the record to justify the jury's inference that the plaintiff sustained damages in at least the amount of the verdict." Chase maintains there is sufficient evidence in the record to support a verdict of at least $2 million.

---

[2] "End-loan losses" resulted from Chase's financing of the purchases of condominium units at below-market interest rates. The $246,000 figure for "end-loan losses" is included in the amount of $5,361,939, shown in Item 4 above for "expenditures." We will assume, without deciding, that American is correct in its contention that "end-loan losses" were not recoverable by Chase.

Chase points out that the figure of $839,672, shown as Item 3 in American's computation above for interest "to date in mid-trial," is computed only upon the amount of the deficiency resulting from the foreclosure. Because, Chase argues, the trial court, at American's insistence, held that damages were to be ascertained as of the time of sellout, rather than the date of foreclosure, Chase was entitled to interest on the amount of its unpaid principal from September 6, 1976, the date of foreclosure, to December 12, 1978, the date of verdict below.

Chase says Instruction P authorized the jury to allow interest on unpaid principal for the period from foreclosure to verdict. American does not dispute this proposition, but contents itself with arguing that there was no evidence to support the greater award of interest and that the jury, therefore, could only have "employed some arcane mathematical formula, which was not presented into evidence," to compute the higher interest award.

Further, American appears to take the position that, because Loren Smith, Chase's accounting expert, showed on Exhibit No. 719 interest only on the amount of the foreclosure deficiency and stated at trial his figures included "no interest . . . on the $12,000,000 foreclosure price," Chase can rise no higher than Smith's testimony and cannot recover more than the interest on the deficiency. If this is American's position, we reject it.

Smith stated that Exhibit No. 719 was prepared, utilizing American's approach to the ascertainment of damages, "to simplify the figures" presented earlier by Joseph Warzecha, an accounting expert called by American. Smith's statement that his figures included no interest on the "foreclosure price" was not an admission that a higher interest figure was improper. Instead, read in context, the statement was an assertion that a higher figure was proper.

Furthermore, Smith's testimony provided a basis upon which the jury, guided by Instruction P and using, not an "arcane formula," but ordinary mathematical calculations, could have awarded Chase interest on the unpaid amount of its principal for the period from date of foreclosure to time of verdict. Using the $12 million figure, representing the foreclosure purchase price, and an interest rate of 15.75% as "called for" in the loan documents, Smith said that interest was accruing on the $12 million figure at $5200 per day. The jury could have calculated that the period from date of foreclosure to date of verdict encompassed 827 days. The $5200 figure multiplied by 827 equals $4,300,400.

Of the $12 million foreclosure purchase price, the amount of $11,946,354, or 99 ½%, represented Chase's share of unpaid principal. Ninety-nine and one-half percent of $4,300,400 equals $4,278,898, the amount of interest the jury could have found had accrued between foreclosure and verdict. Substituting this figure in Item 3 of American's computation above results in the increase in Item 9 from $998,149 to $4,437,375 as the maximum amount recoverable by Chase, or more than twice the $2 million verdict actually returned.

The record provides another method by which the jury could have calculated the interest on Chase's principal from foreclosure to verdict. Using figures provided by another Chase witness, Betty O'Leary, the jury could have found that the loan deficiency of $3,007,332 resulting from foreclosure was approximately one-fourth the amount of Chase's outstanding principal of $11,946,354, that the amount of interest on the deficiency from the date of foreclosure to November 15, 1978, a point in mid-trial, was $839,672, accruing at the rate of $1315 per day, that four times the $839,672 figure equaled $3,358,688 as the interest accrued to November 15, that interest at $1315 per day for the 27 days from November 15 to December 12, the date of verdict, multiplied by four equaled $142,020, and that the total interest for the period from foreclosure to verdict was approximately $3,500,708. Substituting this figure for the amount in Item 3 of American's computation above increases the maximum amount recoverable by Chase in Item 9 from $998,149 to $3,659,185, again far above the amount of the jury's verdict.

We conclude that the trial court did not err in refusing to order a new trial or a remittitur.

## VI.

█ Chase has assigned two cross-errors. The first, relating to the refusal of the trial court to admit certain evidence offered by Chase, has been rendered moot by our decision to uphold the jury's verdict in Chase's favor.

The remaining assignment of error relates to the trial court's ruling that damages in the case were to be ascertained as of the time of the sellout of The Representative, rather than the date of foreclosure. We should correct this error, Chase opines, by modifying the judgment of the trial court and entering final judgment

here for $2,472,862, the "undisputed . . . amount of the loan deficiency and interest."

We reject this assignment of cross-error. Chase secured from the trial court Instruction No. 19, discussed in Part III hereof, which permitted the jury to find that a joint venture existed between American and Chase. We believe the granting of this instruction took the case out of the usual rule that the measure of damages for default in the payment of a deed of trust note is the deficiency resulting from foreclosure. If a joint venture existed between American and Chase, the rights and liabilities stemming from the relationship would have continued past the foreclosure to the final sellout.

Finding no reversible error in the proceedings below, we will affirm the judgment of the trial court.

*Affirmed.*