In re **GENERAL OFFICE FURNITURE WHOLESALERS, INC., Debtor.**

**GENERAL OFFICE FURNITURE WHOLESALERS, INC., Plaintiff,**

v.

**U.S. FURNITURE INDUSTRIES, INC., Defendant.**

**Bankruptcy No. 82–00457–A.**
**Adv. No. 82–0481–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Aug. 17, 1984.

Merrill Cohen, Bethesda, Md., for debtor.

Edward F. Rodriguez, Jr., Boothe, Prichard & Dudley, Fairfax, Va., for defendant.

Richard J. Stahl, Stahl & Buck, P.C., Annandale, Va., trustee in bankruptcy.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Bankruptcy Judge.

An involuntary petition for relief under Chapter 7 of the Bankruptcy Reform Act of 1978 ("the Code") was filed against the debtor, General Office Furniture Wholesalers, Inc., ("debtor") on April 8, 1982.[1] A Complaint to Recover Preferential Payments was filed December 6, 1982. The complaint was amended at the December 12, 1983 trial to include recovery of post-petition payments. The controversy is over eight payments made by debtor to U.S. Furniture Industries, Inc. ("USFI") against the latter's invoices for USFI merchandise sold by debtor to the federal government.[2] The payments were made between January 27, 1982 and April 20, 1982 and total $171,716.30. The issue before the Court is whether debtor's payments were made using "property of the debtor." 11 U.S.C. § 547(b).

Debtor was in the furniture wholesaling business, selling both to commercial clients and, through the General Services Administration ("GSA"), to federal government agencies. Defendant in this action, USFI, is a furniture manufacturer. Debtor began selling USFI merchandise to the govern-ment when debtor acquired on April 9, 1979, Contract Distributors, Inc. ("CDI"), through which USFI had theretofore sold its merchandise to the government. The history of CDI's relationship with USFI is a necessary background to understanding the present circumstances. That relationship was spelled out in a February 8, 1979 Memorandum of Agreement which the presidents of both companies signed. *See* Appendix. According to the testimony of an officer of USFI who attended the meeting at which the agreement was produced, the agreement was prompted by the upcoming merger of CDI into debtor and a desire of the parties to continue the same arrangement post-merger.

CDI and USFI conducted their financial transactions through a "lockbox" account managed by a bank in High Point, North Carolina. GSA payments for USFI merchandise sold by CDI were made into this account, whereupon the bank would draw two checks on the account. The checks represented the moneys due USFI for the merchandise and CDI for selling the furniture. Authorized signatories for CDI and USFI would exchange the checks, countersigning each one. CDI then would keep the check on which it was payee and USFI would keep the check on which USFI was payee. This arrangement enabled USFI to secure payment to itself upon GSA's payment to CDI.

Undisputed evidence was adduced at trial that in February 1979, at a meeting between USFI, CDI, and the debtor, the president of USFI advised debtor that if debtor wanted to do business with USFI, debtor would have to agree to the lockbox account. This procedure differed from debtor's usual practice of factoring its accounts receivable by assigning them to Lazere Financial Corporation ("Lazere"). Under the factoring process, debtor would assign an

---

**1.** On April 21, 1982, the Court entered an Order for Relief *nunc pro tunc* and granted debtor's motion to convert the case to a case under Chapter 11 of the Code. On February 15, 1983, upon debtor's motion, the Court reconverted the case to a case under Chapter 7. A Trustee in Bankruptcy has since pursued this action.

**2.** The complaint lists twelve payments as being preferential. USFI concedes that four payments were preferential for reasons which will be discussed.

**234**

account receivable to Lazere and ship the order to the customer. Debtor would also invoice the customer through Lazere. The foregoing arrangement allowed debtor to draw from Lazere up to 85% of the face value of the invoice. Customer payments were sent either directly to Lazere or first to debtor and then by debtor to Lazere. USFI, however, did not want debtor to factor any accounts receivable generated from USFI merchandise. Debtor's agreement to abide by USFI's wishes is evidenced by a February 16, 1979 letter to USFI's president from debtor's principal who had attended the February meeting between USFI, CDI, and debtor:

> As per our discussion, I am reiterating our commitment that we will not factor any government receivables for merchandise manufactured by United States Furniture Industries that we or any of our subsideries [sic] hold under a GSA contract.

Debtor, therefore, established an account at Virginia National Bank ("VNB") exclusively for payments received on debtor's non-assigned, non-factored, USFI-generated accounts receivable. The direct testimony of an officer of debtor described the operation as being the same as that which had existed between USFI and CDI.

Debtor, however, sometimes received a single GSA payment covering both USFI and non-USFI merchandise. In such cases, debtor would deposit the lump payment in the non-assigned account and then draw a separate check, over its signature only, in order to transfer the non-USFI portion of the payment to Lazere.

The complaint lists as preferential a total of twelve payments made by debtor to USFI. USFI concedes that four of the twelve, made with checks drawn on a "sole account" of debtor pursuant to debtor's "outright purchases" from USFI, were preferential. The remaining eight payments were made with checks drawn on the non-assigned account pursuant to debtor's sales of USFI merchandise to the government and GSA's subsequent payment to debtor for that merchandise. With respect

to seven of the eight payments, trustee proceeds under section 547 of the Code, which allows avoidance of "any transfer of property of the debtor" if all of five enumerated conditions are met. 11 U.S.C. § 547(b); *see In re General Office Furniture Wholesalers, Inc.,* 37 B.R. 180, 182 (Bankr.E.D.Va.1984). With respect to the eighth payment, trustee asserts as authority section 549 of the Code, which deals with postpetition transactions and allows avoidance of "a transfer of property of the estate" if two conditions are met, subject to exceptions. 11 U.S.C. § 549(a). The seven pre-petition payments sought to be avoided under section 547 will be addressed first.

■ The preamble to section 547(b) embodies two conditions for avoiding a payment: that the payment constitute a "transfer" and that the transfer be of "property of the debtor." The Code defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(41). USFI does not dispute that debtor's payments, made by check from the non-assigned account, constituted "transfers." Thus, the issue in the case at bar is whether the funds drawn from the non-assigned account to make the seven payments sought to be avoided were "property of the debtor."

Trustee argues for debtor that (1) debtor's role in the billing and receipt process giving rise to the non-assigned account funds, and particularly (2) debtor's access to and control over the funds, make the funds property of the debtor. USFI, on the other hand, characterizes debtor's payments as improper distributions of USFI's share of the proceeds from furniture sales to GSA. USFI maintains that debtor had no rights to the funds except to the portion representing debtor's commission.

The Code does not define "property" as used in section 547(b), "but the various things which constitute the estate of a debtor are enumerated in section 541." 4 *Collier on Bankruptcy,* ¶ 547.08[2], at 547–32 (15th ed. 1984). Section 541's defi-

nition of property of the debtor's estate is useful to determine what constitutes property of the debtor under section 547 for two reasons: (1) as sections 541(a) and 301 indicate, property of the debtor *is* property of the estate upon filing of the bankruptcy petition subject to any exemptions claimed under section 522; and (2) the principle of section 547 is to avoid "only those preferential transfers that result in a depletion of the debtor's *estate* and that do not fall within one of the exceptions listed in section 547(c)." 4 *Collier on Bankruptcy*, ¶ 547.21, at 547-79 to 547-85 (15th ed. 1984) (emphasis added).

Section 541(a) of the Code defines a debtor's estate broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This definition presents the problem of defining an "interest" in property. "[T]he existence and nature of the debtor's interest in property . . . are determined by non-bankruptcy law. Neither the Code nor the Bankruptcy Act provides any rules for determining whether the debtor has an interest in property." 4 *Collier on Bankruptcy*, ¶ 541.02[1], at 541-10 (15th ed. 1984). The Code of Virginia is silent regarding the issue before the Court.[3] However, "[w]here parties contract lawfully and their contract is free from ambiguity or doubt, the agreement between them furnishes the law which governs them." *Russell Co. v. Carroll*, 194 Va. 699, 703, 74 S.E.2d 685 (1953); *Mercer v. South Atlantic Life Ins. Co.*, 111 Va. 699, 702, 69 S.E. 961 (1911).

The only direct evidence of the contract between the parties with respect to the non-assigned VNB account is that introduced into evidence as the "signature card" for the account. The Title of Account is listed as "Contract Distributors—A Division of General Office Furniture Wholesalers, Inc." and the account address and telephone number is that of debtor's business office. The card bears three signatures—those of Stanley R. Taylor, Arthur Hirst, and Lucy Patterson—in the spaces denominated president, vice president, and secretary, respectively. Those individuals were, in fact, the president, vice president, and treasurer of defendant USFI. The card is dated "4-19-79."

The card does not indicate whether the three signatories were the only authorized signatories for the account or how many of the three signatures were needed in order to draw on the account. On the face of the arrangement between the bank and the parties, therefore, the evidence as to account ownership is completely ambiguous. The account was in the name of one business while the account signatories were principals of another.

However, "when ambiguous contractual provisions are at issue, extrinsic evidence is available to discern the intention of the parties." *Dart Drug Corp. v. Nicholakos*, 221 Va. 989, 993, 277 S.E.2d 155 (1981). Another writing was introduced at trial to evidence the intent of the parties regarding ownership of the non-assigned VNB account and specifically the funds therein. One of debtor's vice presidents clarified debtor's understanding of the financial arrangement between debtor and USFI in an October 7, 1980 letter to USFI's vice president, reading in pertinent part as follows:

> The original agreement between USFI and Contract Distributors was [that] the government's payment address was the bank in High Point [the lockbox account] and when USFI was paid, Contract Dis-

---

**3.** The Virginia Banking Act does address multiple-party account ownership. 1950 Code of Virginia § 6.1–125.1 to 6.1–125.16 (Repl. vol. 1978). At first glance, the statute would appear to solve the issue before the Court by providing that "[a] joint account belongs . . . to the parties in proportion to the net contributions by each to the sums on deposit." *Id.* at § 6.1–125.3. Initially, however, "party" is defined as a person who has a right to payment from a multiple-party account. *Id.* at 6.1–125.1(7): Secondly, "multiple-party account" is defined to exclude "accounts established for deposit of funds of a partnership, joint venture or other association for business purposes." *Id.* at 6.1–125.1(5). The Virginia statute, therefore, does not apply to the non-assigned account with which we are concerned.

tributors was paid. When Contract Distributors was purchased by GOFW, at a meeting in his office Mr. Taylor [USFI's president] reiterated the same conditions and further reiterated that we were to *NEVER* factor or finance any sale of USFI products to the government. GSA contract problems necessitated a change to a bank up here, but the basic arrangement has remained unchanged.

(Emphasis in original.) The "basic arrangement" included that described above as the High Point, North Carolina "lockbox" account whereby the funds, before being made available to any one party, were divided to represent those moneys due USFI for the merchandise and those moneys due debtor for selling the goods. Most importantly, the "basic arrangement" included the provisions of the February 8, 1979 Memorandum of Agreement between USFI and Contract Distributors, among which was the condition that "all funds in connection [with GSA payments to the account] are the sole property of U.S.F.I., save and except the commissions that are due CONTRACT DISTRIBUTORS".[4] Under this provision, debtor's payments to USFI cannot be considered transfers of "property of the debtor".

Trustee argues, however, that the parties' conduct reflected their intent and should be held to constitute a modification of: (1) the lockbox arrangement; (2) the February 8, 1979 Memorandum of Agreement between USFI and CDI; and (3) the understanding expressed in debtor's October 7, 1980 letter to USFI.[5] USFI insists that a variation of the lockbox arrangement was in "full force and effect" between USFI and debtor and that the February 8, 1979 Memorandum of Agreement evidenced the intent of the parties respect-

ing ownership of the funds in the non-assigned account.

▉ It is well established in Virginia case law that "[w]hen the terms of an agreement are doubtful or uncertain, the interpretation placed thereon by the parties themselves is entitled to great weight and will be followed if that may be done without violating applicable legal principles." *American Realty Trust v. The Chase Manhattan Bank*, 222 Va. 392, 403, 281 S.E.2d 825 (1981), *quoting Dart Drug v. Nicholakos*, 221 Va. 989, 995, 277 S.E.2d 155 (1981). While a written contract may be modified by subsequent conduct of the parties relating to the same subject matter, modification requires the assent of all parties to the contract and may not be unilateral. *See Carlucci v. Duck's Real Estate, Inc.*, 220 Va. 164, 167, 257 S.E.2d 763 (1979) (per curiam); 4B M.J. *Contracts*, § 54, at 82–83 (Repl. vol. 1974); 17 Am.Jur.2d, *Contracts*, § 465 (1964). Furthermore,

> The party asserting a modification of a contract carries the burden of proof and he must demonstrate that the minds of the parties definitely met on the alteration. It is not sufficient to show that the adverse party failed to protest the change. But where there is a duty to object or protest the obvious ignoring of specific provisions of a contract, such silence may result in the waiver of one's rights under the provision.

4B M.J., *Contracts*, § 54, at 84–85 (Repl. vol. 1974) (footnotes omitted); *see also Geoghegan Sons & Co. v. Arbuckle Bros.*, 139 Va. 92, 102–04, 123 S.E. 387 (1924); *American Manganese Co. v. Virginia Manganese Co.*, 91 Va. 272, 283–84, 21 S.E. 466 (1895); 17 Am.Jur.2d, *Contracts*, § 465, at 935 (1964). Trustee does not suggest that the parties' minds met on a modified agreement under which debtor owned

---

4. It should be noted that when the merger between debtor and CDI became effective, debtor became liable for all of CDI's liabilities and obligations, including those memorialized in the February 8, 1979 Memorandum of Agreement between CDI and USFI. 1950 Code of Virginia § 13.1–74(e) (Repl. vol. 1978).

5. The trustee argues that the burden of persuasion lies with USFI on the "property of the debtor" element of § 547(b). The burden of persuasion on this element, as with all elements of an action to avoid a preferential transfer under § 547(b), is on the trustee. 4 *Collier on Bankruptcy*, ¶ 547.55, at 547–160.17 to 547–164 (15th ed. 1984).

the account and the funds therein. Therefore, to prevail trustee must establish not only that USFI failed to protest the asserted modification but also that USFI had a duty to object to or protest an "obvious" ignoring of specific contract provisions.

Trustee presents several circumstances to demonstrate a modified arrangement: debtor, itself, deposited GSA's payments into the non-assigned account; debtor, itself, drew the checks on the account; there was no requirement that at least one signature on a check be that of a USFI representative; and debtor could, and did, draw checks on the account without USFI's countersignature and deposit such checks in debtor's general operating account. These circumstances are not persuasive in view of trustee's burden of showing debtor's "obvious" ignoring of contract provisions. An examination of debtor's representations and actions reveals that USFI could not have been put on notice thereby.

Debtor never suggested to USFI that changing from the High Point, North Carolina lockbox account to the VNB non-assigned account contravened the February 8, 1979 Memorandum of Agreement provision that all funds in connection with USFI merchandise were the sole property of USFI save and except debtor's commissions. To the contrary, debtor had requested the change in accounts because its contract negotiators were in Virginia and debtor apparently concluded that having a payment schedule in North Carolina as well as in Virginia would detract from debtor's credibility in the eyes of GSA. In its October 7, 1980 letter to USFI, debtor accepted no responsibility for the change in accounts by stating that "GSA contract problems necessitated a change to a bank up here." Not only were debtor's express reasons for changing accounts insufficient to put USFI on notice of any modifications but debtor went so far as to reassure USFI that despite the change in accounts, "the basic arrangement has remained unchanged."

At all times, debtor's actions in connection with the VNB non-assigned account were consistent with the October 7, 1980 letter. In fact, debtor's actions reflect active compliance with the February 8, 1979 Memorandum of Agreement and the principle of the lockbox arrangement. Although a High Point, North Carolina bank previously had managed the lockbox account, debtor later managed the VNB non-assigned account as though it were the lockbox account. Following the established procedure, debtor would draw two checks on the account representing the moneys due USFI for the merchandise and due debtor for making the sale. The checks were then sent to USFI for its countersignature. USFI kept the check payable to itself and returned to debtor the check on which debtor was payee.

Trustee notes that debtor was receiving GSA payments and making deposits to the non-assigned account rather than such payments being made directly into the account under the lockbox arrangement. Debtor's receipt of payments was to be expected insofar as it was pursuant to payment instructions debtor gave to GSA. More significant is the manner in which debtor acted upon receipt of a GSA payment belonging in the non-assigned account. Debtor would deposit such a payment in the non-assigned account except to the extent, if any, that the payment was for non-USFI merchandise and should more properly go to Lazere.

Trustee notes also that debtor drew checks on the non-assigned account without obtaining USFI's countersignature and deposited those checks in debtor's general operating account. The evidence demonstrates, however, that debtor was not by such action asserting ownership of the non-assigned account funds but, to the contrary, carefully segregating funds generated by sales of USFI merchandise from all other funds. Funds drawn from the non-assigned account over debtor's signature alone and deposited in debtor's general operating account were portions of GSA payments covering non-USFI merchandise. In fact, trustee's own evidence demonstrates that no creditor, other than USFI, ever

received a check from the non-assigned account.

Trustee notes, however, that nothing restricted debtor from depositing GSA payments for USFI merchandise in debtor's general operating account and using those funds to pay other creditors. This circumstance and the fact that debtor never took advantage of it certainly support the original February 8, 1979 Memorandum of Agreement rather than any asserted modification of that agreement. Debtor took pains to comply with the provisions of the agreement as closely as possible. Trustee cannot now argue that because debtor might have gotten away with less compliance, debtor should not be bound by the agreement.

The evidence does not justify, legally or equitably, reading a modification into the clear provisions of the February 8, 1979 Memorandum of Agreement between USFI and CDI, the company debtor acquired. The funds in the non-assigned account were "the sole property of USFI, save and except the commissions that are due [debtor]." Trustee does not dispute that the payments at issue were due USFI rather than debtor. Therefore, the funds with which the payments were made were not property of the debtor within the meaning of § 547(b) and the payments may not be avoided.

The Court's findings and conclusion regarding trustee's claim under section 547 also dispose of the claim under section 549. The trustee may avoid postpetition transfers only of "property of the estate." 11 U.S.C. § 549(a). "Property of the estate" is defined, *inter alia,* as property in which the debtor has "legal or equitable interests ... as of the commencement of the case." 11 U.S.C. § 541(a)(1). As has been demonstrated, debtor had no such interest in the fund from which the postpetition payment at issue was made. Trustee has therefore failed to meet an essential requirement for avoiding such payment.

Thus, as a result of the foregoing, the relief prayed for in the complaint to recover preferential payments must be denied in

that the funds sought to be recovered were not property of the debtor, nor of the debtor's estate, as required by sections 547(b) and 549(a) of the Code.

An appropriate Order will enter.

## APPENDIX TO MEMORANDUM OPINION

The Memorandum of Agreement between U.S. Furniture Industries, Inc. and Contract Distributors, Inc. reads, in pertinent part:

### WITNESSETH:

WHEREAS U.S.F.I. has in the past and will continue to do so in the future sell its merchandise to GENERAL SERVICES ADMINISTRATION (GSA), by and through CONTRACT DISTRIBUTORS; and

WHEREAS CONTRACT DISTRIBUTORS is agent for U.S.F.I., and as such, bills G.S.A. for U.S.F.I.'s merchandise directly;

WHEREAS CONTRACT DISTRIBUTORS is at all times agent for U.S.F.I.;

NOW THEREFORE, the parties do mutually agree:

1. On all merchandise delivered by U.S. F.I. on billings to G.S.A., title to said merchandise shall remain at all times in U.S. F.I.; and

2. CONTRACT DISTRIBUTORS is at all times, in the handling of all sales to G.S.A. of U.S.F.I.'s merchandise, agent for U.S. F.I., and it is not intended between the parties or otherwise that CONTRACT DISTRIBUTORS is the owner of the merchandise delivered by U.S.F.I. for G.S.A.; and

3. CONTRACT DISTRIBUTORS acts solely as agent for U.S.F.I. on all sales to G.S.A.; and

4. Heretofore and the same shall continue, G.S.A. shall make payment on all such merchandise furnished by U.S.F.I. and billed under the name of CONTRACT DISTRIBUTORS to High Point Bank and Trust Company, High Point, North Carolina, in the name of CONTRACT DISTRIBUTORS;

but that all funds in connection wherewith are the sole property of U.S.F.I., save and except the commissions that are due CONTRACT DISTRIBUTORS. U.S.F.I. shall, from said account, pay itself the amount due U.S.F.I. and the remainder of each payment by G.S.A. represents commissions due CONTRACT DISTRIBUTORS and are to be retained by CONTRACT DISTRIBUTORS for that purpose and for that purpose only; and

5. This arrangement may not be changed orally and shall continue until modified in writing by both U.S.F.I. and CONTRACT DISTRIBUTORS.